**XEROX CORPORATION, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MA-CHINES CORPORATION,**
Defendant.

No. 70 Civ. 1596 (DNE).

United States District Court,
S. D. New York.

July 23, 1974.

Francis J. Hone, of Brumbaugh, Graves, Donohue & Raymond, Francis T. Carr, of Kenyon & Kenyon, Reilly, Carr & Chapin, New York City, for plaintiff.

William K. Kerr, of Fish & Neave, New York City, for defendant; Pennie & Edmonds, New York City, of counsel.

## OPINION

EDELSTEIN, Chief Judge:

In 1970, International Business Machines Corporation (hereinafter referred to as "IBM") introduced commercially a xerographic office copier ("Copier I"). Thereupon, on April 21, 1970, Xerox Corporation (hereinafter referred to as "Xerox") instituted its first suit (hereinafter referred to as "the 1970 action") against IBM, alleging, in essence, that the manufacture and sale of Copier I infringes certain patents issued to Xerox and constitutes a misappropriation by IBM of Xerox trade secrets and confidential information. Subsequently, in 1973, IBM introduced commercially a second xerographic office copier ("Copier II"); and on August 3, 1973, based upon claims of patent infringement and trade secret misappropriation, Xerox filed its second suit against IBM (hereinafter referred to as "the 1973 action"). IBM denies that it has infringed any of Xerox's patents or that it has misappropriated any of Xerox's trade secrets or confidential information. Moreover, as to the patent infringement cause of action, IBM contends that, for various reasons,[1] the Xerox patents are unen-

forceable; and, as to the trade secret misappropriation cause of action, IBM contends, *inter alia,* that it did not utilize information which could qualify as a trade secret and that the copier marketed by IBM was a result of IBM's own research, design and development.

During the course of pre-trial, both parties have engaged in extensive discovery. Because of the numerous problems which were generated by the parties' discovery demands, both parties suggested that the court appoint in the 1970 action a Special Master for the purpose of recommending to the court resolutions of certain discovery disputes. On November 21, 1973, this court entered Special Master Order No. 1 appointing Lawrence J. McKay as Special Master; on December 3, 1973, this court entered Special Master Order No. 2 referring certain discovery disputes to the Special Master for his consideration; and on February 21, 1974, the Special Master submitted his first report, entitled Special Master's Report and Recommendations, encompassing the following discovery problems:

1. IBM Demand for Production of Previously Produced Documents to the FTC and the SCM Corporation;

2. IBM's Refusal to Permit Answers to Deposition Questions Involving Allegedly Confidential Information;

3. Applicability of the Order Issued by Judge Edward C. McLean on February 9, 1972;

4. Production by IBM of the "Galbi" Notes.

The only objection to the Special Master's Report and Recommendations was filed by Xerox and is addressed to the Special Master's recommended resolution of the third problem listed above. The court will address itself to this objec-

---

1. IBM's unenforceability claims are based upon IBM's allegation that Xerox has misused its patents and upon IBM's allegation that Xerox improperly prosecuted in the Patent Office some of the patents in suit. More-

over, for the reasons set forth in paragraph 39 of IBM's Answer and Counterclaim, 70 Civ. 1596 (DNE) (S.D.N.Y. July 22, 1970), IBM contends that Xerox's patents are invalid and void, hence unenforceable.

tion, *infra*. In addition, the court believes, that while no objections were interposed against the Special Master's recommended resolution of the remaining three problems, two of the problems —Nos. 2 and 4—require some discussion before the court rules upon them. As to the first problem, however, the court does not believe that additional discussion is necessary. Thus, because there are no objections to this portion of the Special Master's Report and Recommendations and because the court agrees with the Special Master's proposed resolution, the court adopts, in full, this portion of the Special Master's Report and Recommendations. Xerox is therefore directed to make available for inspection by defendant, on a "counsel only" basis in accordance with the April 1, 1974 stipulation entered into by the parties, the 21 cartons of documents previously produced by Xerox to the Federal Trade Commission and the SCM Corporation. This production is to be made as soon as practicable at a place to be agreed upon by counsel, subject to the terms of the protective orders which have been entered in this case, with leave to apply for such additional protective provisions as may be deemed necessary.

## IBM'S REFUSAL TO PERMIT ANSWERS TO DEPOSITION QUESTIONS INVOLVING ALLEGEDLY CONFIDENTIAL INFORMATION

### A. *Background*

The facts of this controversy are set forth in detail in the February 21, 1974 Special Master's Report and Recommendations, annexed hereto as Appendix A, and need not be repeated here. Suffice it to say that the controversy is limited to the 1973 action and that it is based upon IBM's assertion that Xerox's attempts "to elicit information concerning IBM research and development activities, since the April 21, 1970 cut-off date for discovery in the 1970 action, and unrelated to the manufacture of Copier II or to any other product mar-

keted by IBM" is not relevant to the subject matter of this action; and upon IBM's demand that Xerox particularize the trade secrets upon which it relies in support of its claim that IBM misappropriated such information in the manufacture of Copier II. IBM Memorandum for Special Master McKay 27 (Dec. 19, 1973).

The Special Master, for the reasons contained in his Report and Recommendations, rejected IBM's attempt to limit discovery in the 1973 action and concluded that Xerox should particularize its unfair competition claims. Thus, the Special Master proposed that Xerox should be directed to furnish to counsel for IBM and to the Special Master a list of those documents, whether or not previously furnished to IBM, which contain or comprise the data and information claimed to be "confidential information" or "trade secrets" and which form the bases of the Xerox claims in the 1973 action. The Special Master also proposed that, upon receipt of this list, IBM should be directed to permit witnesses to answer questions concerning marketed and unmarketed products which bear any relevance to the materials contained in the list so furnished.

### B. *Events Subsequent to the Filing of the Special Master's Report and Recommendations*

On March 15, 1974, in voluntary compliance with the Special Master's ruling, Xerox furnished to IBM counsel a list of documents "containing or referring to items of trade secrets and confidential data and know-how which form the bases of the Xerox claims of unfair competition in this action." According to Xerox, "the items of trade secret information and confidential data and know-how improperly used by IBM" are "described in detail or incorporated by reference" in the documents.

Shortly thereafter, IBM submitted to the Special Master a memorandum objecting to Xerox's list on grounds of in-

adequacy. IBM's objection is directed towards those documents listed by Xerox which contain, refer to, or incorporate by reference many items of xerographic and other technical information, only some of which is considered by Xerox to be trade secrets or confidential information misappropriated by IBM. Because Xerox's list refers to documents in their entirety and not to the specific information contained therein, IBM wants Xerox to specify which of the information contained, referred to, or incorporated by reference in these documents are the trade secrets or confidential information alleged by Xerox to have been misappropriated by IBM. It is IBM's contention that, without this refinement of Xerox's trade secret claims, it cannot properly define the scope and relevancy of discovery in the 1973 action.

Xerox responded by claiming that its list complied with the Special Master's proposed order. However, in an effort to avoid further controversy on the subject, Xerox furnished IBM counsel with a modified list of trade secret documents. Unfortunately, instead of avoiding a controversy, the modified list generated a second set of objections from IBM, who still found the list to be inadequate for the same reasons advanced in its first memorandum.

### C. *Discussion*

■ At the outset, it must be noted that this particular controversy deals only with the 1973 action; and the Special Master's authority, as conferred upon him by Special Master Orders Nos. 1 and 2, is limited to the 1970 action. Consequently, the court is faced with the threshold question of whether to reject the Special Master's recommendation because he exceeded his authority or to attempt to eliminate this problem and other problems which have arisen, or which will arise, solely because the 1970 action and the 1973 action, two virtually identical cases, have remained separate and distinct entities. It is the court's opin-

ion that it would be counter-productive to ignore or reject a proposed resolution of a dispute which affects the progress of pre-trial discovery in the 1973 case and which is amenable to both parties. Therefore, since the court agrees with the Special Master's recommendation, the court adopts this portion of the Special Master's Report and Recommendations. However, in order to eliminate potential and existing problems generated solely because the two cases remain separate and distinct entities, the court believes that the two cases should be consolidated. The court, therefore, has entered an order consolidating for all purposes the 1973 action with the 1970 action.

■ The only question remaining is whether Xerox's lists of trade secret documents comply with the Special Master's instruction that "Xerox must specify that data and information which forms the bases of its cause of action." To the extent that Xerox has not specified which information contained in, referred to by, or incorporated by reference in the documents listed by Xerox are considered by Xerox to be trade secrets or confidential information, the court believes that Xerox has failed to comply with the Special Master's instruction.

■■ At the very least, a defendant is entitled to know the bases for plaintiff's charges against it. The burden is upon the plaintiff to specify those charges, not upon the defendant to guess at what they are. Thus, after nearly a year of pre-trial discovery, Xerox should be able to identify in detail the trade secrets and confidential information alleged to have been misappropriated by IBM. Clearly until this is done, neither the court nor the parties can know, with any degree of certainty, whether discovery is relevant or not; and it is doubtful whether Xerox can undertake a meaningful discovery program, which includes its attempt to trace the flow of trade secrets and confidential informa-

tion through IBM, without first identifying which trade secrets and what confidential information IBM has misappropriated. Therefore, in the list furnished to IBM pursuant to the Special Master's instructions, Xerox shall

(1) identify in detail all trade secrets and confidential information alleged to have been misappropriated by IBM;

(2) list all documents which contain, refer to, or incorporate by reference Xerox trade secrets or confidential information; and

(3) key all documents or portions thereof to the specific trade secrets and confidential information alleged to have been misappropriated by IBM.

Xerox shall furnish this new list to IBM within 90 days from the date of this order.

## APPLICABILITY OF THE ORDER ISSUED BY JUDGE EDWARD C. McLEAN ON FEBRUARY 9, 1972

### A. *Background*

The February 9, 1972 Order, and the subsequent March 7, 1972 Stipulation entered into by the parties at the direction of Judge McLean and "so ordered" by Judge Metzner, govern the production of documents allegedly protected by the attorney-client privilege or the attorney's work product privilege.[2] These Orders were issued in response to Xerox's refusal to answer, and, in appropriate circumstances, to produce documents requested by, certain interrogatories which had been propounded by IBM. The instant controversy has also been precipitated by Xerox's refusal to turn over to IBM certain allegedly privileged documents. In essence, the basis for the dispute, which is set forth with greater specificity in the Special Master's Report and Recommendations annexed

hereto as Appendix A, is the parties' interpretation of Judge McLean's Order: IBM contends that it covers all attorney-client and work product documents involved in this case, while Xerox argues that the Order covers only certain documents involved in the dispute before Judge McLean.

### B. *The Special Master's Report and Recommendations*

In his Report and Recommendations, the Special Master stated that Judge McLean's Order covers all documents relating to the 1970 action withheld on the grounds of attorney-client privilege or attorney's work product; and recommended that Xerox and IBM, in accordance with the terms of Judge McLean's Order, should exchange all relevant documents still withheld in the 1970 action on the ground of attorney-client privilege but not attorney's work product and should exchange lists of all relevant documents withheld in the 1970 action on the ground of attorney's work product and not previously listed. The Special Master proposed a date by which this exchange is to occur. The Special Master, recognizing that the parties might press for unrestricted production of some of the documents produced, also proposed a schedule which establishes a date for notification of challenges to documents designated as privileged; a date for the submission to the Special Master of documents to which a challenge has been made; and dates for the submission to the Special Master of memoranda in support of their respective contentions.

### C. *Events Subsequent to the Filing of the Special Master's Report and Recommendations*

On March 8, 1974, Xerox filed two objections to this portion of the Special Master's Report and Recommendations.

---

2. The relevant portions of Judge McLean's February 9, 1972 Order (paragraphs 3, 7–9), are quoted in the Special Master's Report and Recommendations at pp. 4–5, 14–15.

Xerox's first objection is "on the ground that production by Xerox to IBM of privileged documents is unwarranted and likely to cause Xerox irreparable injury." (Plaintiff's Memorandum Opposing the Entering of Special Master Order No. 3, 70 Civ. 1596 (DNE) 2 (S.D. N.Y.) (hereinafter referred to as "Plaintiff's Memorandum")). This argument, which was not presented to the Special Master, is based upon Xerox's interpretation of this court's action in the Government's antitrust case against IBM, United States v. IBM, 69 Civ. 200 (DNE) (S.D.N.Y.), regarding Pretrial Order No. 5, entered September 26, 1972, and involving allegedly privileged documents produced by IBM to Control Data Corporation (hereinafter referred to as "CDC") in CDC's private antitrust suit against IBM, Control Data Corp. v. IBM, 3–68 Civ. 312 (D.Minn.). According to Xerox, Pretrial Order No. 5 "required IBM to produce to the Government on an unrestricted basis the documents as to which IBM claimed privilege and produced pursuant to a protective order in Control Data Corporation v. IBM, in the Minnesota District Court." (Plaintiff's Memorandum at 3). It is Xerox's belief, bolstered by the Second Circuit's first decision in IBM's appeal from Pretrial Order No. 5, 471 F.2d 507 (2d Cir. 1972),[3] that the production in the *CDC* case (hereinafter referred to. as "CDC production") was pursuant to an order of the Minnesota District Court which protected and preserved the privileged status of any allegedly privileged documents produced by IBM to CDC. Thus, Xerox contends that the result of this court's decision requiring IBM to produce to the Government the allegedly privileged documents which IBM had produced to CDC is that protective orders are insufficient to protect privi-

leged documents; and therefore Xerox objects to producing privileged documents to IBM on the ground that its production to IBM of privileged documents pursuant to Judges McLean's and Metzner's Orders might likewise be deemed a waiver of privilege in other actions in which Xerox is a party. Xerox also reiterates its view, presented to the Special Master, that Judge McLean's Order covers only certain documents involved in the dispute before Judge Mc-Lean.

Xerox's second objection concerns the Special Master's establishment of a schedule for hearing all challenges to claims of attorney-client privilege and attorney's work product. Xerox's objection to the Special Master's action is twofold. First Xerox contends that the Special Master lacks the authority to hear all challenges to claims of attorney-client privilege and attorney's work product because Special Master Order No. 2 did not reference *all* controversies involving claims of privilege and work product to the Special Master. Second, Xerox maintains that the scheduling of challenges to claims of attorney-client privilege and attorney's work product is premature. The basis for this second point is Xerox's claim that the narrowing of the issues has not been completed; and that since the narrowing of the issues may "substantially reduce" the "number of apparently significant documents subject to a privilege claim," there is no reason to determine the status of documents which may not be used in the case.

IBM's response to Xerox's first objection is that it believes that this court's decision relating to Pretrial Order No. 5 in United States v. IBM is incorrect; that, regardless of the outcome of United States v. IBM, IBM should not be de-

3. It should be noted that this decision was reversed by the court *en banc*, 480 F.2d 293 (2d Cir. 1973) and that the Supreme Court denied certiorari 416 U.S. 980, 94 S.Ct. 2413, 40 L.Ed.2d 777 (1974). For a discussion of the litigation history, *see* United States v.

IBM, 60 F.R.D. 658, 660–665 (S.D.N.Y.), appeal dismissed, 493 F.2d 112 (2d Cir. 1973) cert. denied 416 U.S. 980, 94 S.Ct. 2413, 40 L.Ed.2d 777 (1974) ; United States v. IBM, 62 F.R.D. 530 at 539 n. 23 (S.D.N. Y.1974).

prived of its rights under prior orders of this court in this case; and that the procedures incorporated in the February 9, 1972 and March 8, 1972 Orders were intended by Judges McLean and Metzner to protect the documents from losing their privileged status.

With respect to Xerox's second objection, IBM does not specifically refute Xerox's claim that the Special Master exceeded his authority, but rather labels the argument as "captious at best." IBM does, however, indicate that the endorsement of the Special Master's proposed procedure will expeditiously resolve challenges to claims of privilege. In response to Xerox's prematurity claim, IBM argues that the case is in its fifth year; that it is Xerox's fault for failing to refine the issues; and that the scheduling presents an excellent opportunity for forcing Xerox to come to grips with the substance of the case.

### D. *Discussion*

The court agrees with the Special Master's interpretation of Judge McLean's Order and therefore adopts the Special Master's proposed finding that the terms of Judge McLean's Order requires both Xerox and IBM to produce to one another all relevant documents withheld on the ground of attorney-client privilege but not attorney's work product and to produce to one another lists of all relevant documents withheld in the 1970 action on the ground of attorney's work product. Moreover, since the 1970 action has been consolidated with the 1973 action for all purposes (*see* Order of Consolidation, 70 Civ. 1596 (DNE) (S.D.N.Y. July 23, 1974), all documents, and not just those documents previously associated with one aspect of this case, are governed by the Orders entered by Judges McLean and Metzner.

██ Xerox's irreparable injury argument based upon Xerox's interpretation of this court's action in United States v. IBM reveals a failure on the part of Xerox to conscientiously examine the facts underlying the court's entry of Pretrial Order No. 5. Had Xerox undertaken such an examination of the facts, it would have been clear to Xerox that the facts in the antitrust case are different from the facts in the instant case. In any event, Xerox's objection requires this court to speculate as to other courts' rulings and decisions and is thus not properly before this court.

Therefore, the parties are directed to exchange in accordance with the provisions of the Order entered by Judge McLean, and the provisions of the subsequent Stipulation and Order entered by Judge Metzner, all relevant documents withheld on the ground of attorney-client privilege (but not attorney's work product) and lists of all relevant documents withheld on the ground of attorney's work product. The parties are also to exchange the customary information concerning the documents and lists of documents produced. *See* Special Master's Report and Recommendations at 8. The Special Master is to establish a reasonable time schedule for the exchange of documents and lists of documents.

Finally, with respect to Xerox's second objection, the court agrees with Xerox that the Special Master lacks the authority, under Special Master Orders Nos. 1 and 2, to schedule and to hear all challenges to claims of attorney-client privilege and attorney's work product and to make recommendations to the court. However, the court believes that the Special Master should have such authority and should be permitted to exercise such authority in a manner which will assist the court in its endeavors to complete discovery in this case. Completion of discovery necessarily means narrowing the issues, a task which should have been concluded by this stage of pre-trial. If, as Xerox has represented, the issues still need to be narrowed, and if, as has been suggested, the Special Master's handling of challenges to claims of privilege will force the parties

to reevaluate their respective positions and to narrow the issues in this case, the court welcomes this result; for, as the Copier I aspect of this litigation enters its fifth year, the parties should be looking toward terminating, rather than prolonging, pretrial discovery.

Thus, after the parties have exchanged documents and lists of documents, they are to pursue challenges to claims of privilege in accordance with the procedures outlined by the Special Master in his February 21, 1974 Report and Recommendations. The Special Master is to establish a reasonable time schedule for the exchange of notices of challenges to claims of privilege, for the submission to the Special Master of memoranda in support of the parties' respective contentions and for the production to the Special Master of the allegedly privileged documents. After reviewing the parties' contentions and the documents, the Special Master shall submit to the court for the court's approval his recommendations along with all documents and memoranda which the parties have submitted to the Special Master. The recommendation to the court shall include a brief description of the contents of the documents, a statement of the nature of the privilege claimed, a summarization of the parties' contentions, and a detailed explanation of the Special Master's reasons for his conclusions. The Special Master, in his recommendations to the court, shall be guided by this court's decision in United States v. IBM (S.D.N.Y. June 27, 1974).

## PRODUCTION OF THE "GALBI" NOTES

### A. *Background*

Elmer Galbi, an "in-house" attorney for IBM, conducted an investigation within IBM in March and April of 1970 in anticipation of the litigation brought by Xerox against IBM on April 21, 1970. The purpose of the investigation was to determine the path alleged Xerox trade secrets had taken through the IBM organization and the use by IBM of those trade secrets. During the course of his investigation, Mr. Galbi interviewed 37 IBM employees and made notes of these interviews.

Because the flow of Xerox trade secrets through IBM and the use of those secrets by IBM personnel is believed by Xerox to be crucial to its case, Xerox requested and received from IBM a list of the 37 persons interviewed by Mr. Galbi. Xerox then deposed 23 of the 37 employees, as well as Mr. Galbi. At the depositions, Xerox was unable to elicit the information it desired because of "the inability of witnesses (a) to recall Xerox documents to which they had access and (b) to recall the use made by themselves and others, if any, of the information contained in such Xerox trade secret documents." (Affidavit of Frank W. Ford, Jr. in support of Plaintiff's Request for Production of the Galbi Notes, ¶ 6 (70 Civ. 1596–DNE)). This description of the depositions has not been controverted by IBM. It also seems as if IBM objected to questions to witnesses relating to what was said between Mr. Galbi and the witness (transcript of Dec. 20, 1973 hearing before the Special Master at 24); however, the transcript is unclear on this point.

Because Xerox has been unable to obtain the information sought, it has demanded production of Mr. Galbi's notes of these interviews. IBM has refused to produce the notes, claiming that the notes constitute attorney's work product within the meaning of Fed.R.Civ.P. 26(b) (3). Rule 26(b)(3) states:

> *Trial Preparation: Materials.* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney,

consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation. IBM argues that the Galbi notes represent "the mental impressions, conclusions, opinions, or legal theories of an attorney," and, as such, are protected absolutely from discovery by the second sentence of the rule. Moreover, IBM maintains that Xerox has not made a sufficient showing of substantial need or undue hardship under the first sentence of the Rule.

Xerox's position is that, although the Galbi notes were prepared by an attorney in anticipation of litigation, it has shown, by its total inability to obtain the information from other sources, the substantial need and undue hardship required by the language of Rule 26(b)(3) to allow disclosure of the Galbi notes. Xerox has further stated that it does not want from IBM Galbi's mental impressions, conclusions, opinions or legal theories; Xerox only wants the factual information contained in the notes. Xerox has thus proposed that the notes be submitted to the Special Master for masking.

### B. *The Special Master's Report and Recommendations*

The Special Master divided the notes into two groups: notes of interviews of persons deposed by Xerox (which numbers 23 persons) and notes of interviews of persons not yet deposed by Xerox (which numbers 14 persons). As to the first group of notes the Special Master found that Xerox made a sufficient showing of substantial need and undue hardship. The Special Master therefore directed IBM to produce the Galbi notes to him so that he might determine which portions, if any, should be excised. The Special Master also gave IBM leave to submit a memorandum to him arguing the nature of each portion of the Galbi notes it deems exempted from the requirements of Rule 26(b)(3) by the second sentence of the Rule.

As to the second group of notes, the Special Master found that Xerox had not shown sufficient hardship in gathering the information by alternative means and therefore declined to order production of those notes.

### C. *Events Subsequent to the Filing of the Special Master's Report and Recommendations*

IBM did not object to the Special Master's Report and Recommendations. On April 9, 1974, IBM produced to the Special Master the Galbi notes. IBM also submitted to the Special Master a memorandum concerning the Galbi notes. However, instead of addressing itself to specific portions of the notes which IBM believed should be excised, IBM reargued its position that the notes constituted mental impressions, conclusions, opinions, or legal theories of an attorney and therefore should not be produced. Xerox objected to IBM's tactic, contending that the issue is no longer before the Special Master, having been fully presented to and decided by the Special Master.

### D. *Discussion*

In the first instance, IBM has neither opposed nor objected to any portion of the Special Master's Report and Recommendations; and more particularly, it has not objected to that portion of the Special Master's Report and Recommendations which directed IBM to produce the Galbi notes. In fact, in a letter to the court dated March 15, 1974, coun-

sel for IBM urged the court to adopt the Special Master's Report and Recommendations and to endorse the Special Master's proposed order; and on April 9, 1974, IBM in an apparent effort to show its good faith compliance with the proposed order, voluntarily produced the Galbi notes to the Special Master. Now, after IBM has continually indicated its willingness to produce the notes, IBM is attempting to reargue the work product issue before the Special Master. But the fact remains that IBM did not object to the Special Master's Report and Recommendations and did urge the court to adopt it. IBM's action clearly indicates its approval of the Special Master's Recommendations and thus the court can approve the report on this ground alone. However, because the work product question continues to present discovery problems, the issue will be dealt with by the court at this time.

The issue before this court is whether notes of interviews of witnesses which are taken by an attorney in anticipation of litigation, but which do not constitute a verbatim recording of the witnesses' statements, are qualifiedly privileged, and thus discoverable upon a showing of substantial need and undue hardship as required by Rule 26(b)(3) or whether they are absolutely privileged, and thus totally immune from discovery.

The rule relating to attorney's work product had its genesis in the Supreme Court's 1947 ruling in Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and is contained in the 1970 amendment to Fed.R.Civ.P. 26(b)(3), which purported to codify, and to clarify, the *Hickman* decision. Advisory Committee's Explanatory Statement Concerning Amendments of the Discovery Rules, 48 F.R.D. 487, 499–502 (1970). However, the question of whether or not attorney's work product is absolutely or qualifiedly privileged persists, as evidenced by the Seventh Circuit's holding in Harper & Row Publishers, Inc. v. Decker, 423 F.2d 487 (7th Cir. 1970), aff'd mem. by an equally divided court, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971) (qualified privilege) and (as IBM noted) the Eighth Circuit's holding in In Re Grand Jury Proceedings, 473 F.2d 840 (8th Cir. 1973) (absolute privilege). In Harper & Row, the Seventh Circuit, characterizing the attorney's work product privilege as a qualified privilege, let stand the district court's decision ordering production of an attorney's memoranda of interviews of witnesses. The production order was based upon the district court's holding that the failure of memories of witnesses caused by the lapse of time was a sufficient showing of good cause.[4]

In In re Grand Jury Proceedings, a district court ordered an attorney to answer all questions asked by a Grand Jury investigating the attorney's corporate client relating to the attorney's interviews with nonemployees of his corporate client undertaken by the attorney in anticipation of litigation involving his client; and to furnish to the Grand Jury any notes, memoranda or other records of those interviews. Claiming that the information sought constituted attorney's work product, and therefore protected from compelled disclosure, the attorney refused to furnish the information to the Grand Jury and was held in civil contempt. The Eighth Circuit, in reversing the district court, decided that

---

4. *See also* United States v. Murphy Cook & Co., 52 F.R.D. 363 (E.D. Pa. 1971), in which the court ordered production of statements of witnesses given to defendant's insurer. Plaintiff contended that subsequent interviews with the witnesses yielded little or no information and that it was in substantial need of the information. The court held that "[t]here is no doubt that production of a statement should be ordered if a witness has a faulty memory and can no longer relate details of the event . . . . The mere lapse of time is in itself enough to justify production of material otherwise protected as work product." *Id.* at 364 (citation omitted).

the work product doctrine is applicable to grand jury proceedings and held that, under *Hickman,* "the work. product sought in this case is absolutely, rather than conditionally, protected." 473 F.2d at 848. The court also made a finding that, even if the work product was not absolutely protected, the Government had failed to make a sufficient good cause showing because the persons interviewed by the attorney had not been questioned by the Grand Jury and were available to the Grand Jury.

This court believes, for the reasons articulated below, that neither *Hickman,* nor Fed.R.Civ.P. 26(b)(3), as amended, confer an absolute privilege on the information sought by Xerox in this case.

In *Hickman,* an attorney (Fortenbaugh) interviewed various individuals in connection with a maritime accident. Some of these interviews were with the survivors of the accident, and others were with persons believed to have some information relating to the accident. As to the former group, Fortenbaugh obtained signed statements from the survivors; as to the latter, Fortenbaugh made memoranda of *some* of the interviews.

The petitioner requested, and the District Court directed, that Fortenbaugh produce *"all* written statements of witnesses and to state in substance any facts learned through oral statements of witnesses to him." *Id.* 329 U.S. at 509, 67 S.Ct. at 393 (emphasis added). The Supreme Court denied production, stating that the circumstances of the case did not justify production. As the Supreme Court stated:

Petitioner has made more than an ordinary request for relevant, non-privileged facts in the possession of his adversaries or their counsel. He has sought discovery as of right of oral and written statements of witnesses whose identity is well known and whose availability to petitioner appears unimpaired.

*Id.* at 508, 67 S.Ct. at 392. The Supreme Court went on to state (1) that production was sought after petitioner had made "the most searching inquiries of his opponents as to the circumstances surrounding the fatal accident, which inquiries were sworn to have been answered to the best of their information and belief," *id.* at 508, 67 S.Ct. at 392, (2) that interrogatories were served and were properly answered, and (3) that the persons who had been interviewed by Fortenbaugh had testified at public hearings before the United States Steamboat Inspectors and that their testimony was available for examination. Moreover, there was no suggestion that petitioner's counsel had attempted to elicit the facts from the persons interviewed by Fortenbaugh, either by way of informal interviews or formal oral depositions.

In sum, the Supreme Court found that petitioner had failed to establish sufficient justification for the material requested. As the Supreme Court stated:

We are . . . dealing with an attempt to secure the production of written statements and mental impressions contained in the files and the mind of the attorney Fortenbaugh *without any showing of necessity* or any indication or claim that denial of such production would unduly prejudice the preparation of petitioner's case or cause him any hardship or injustice. For aught that appears, the essence of what petitioner seeks either has been revealed to him already through the interrogatories or *is readily available to him direct from the witnesses for the asking.*

*Id.* at 509, 67 S.Ct. at 392 (emphasis added). Specifically, as to the oral statements made by witnesses to Fortenbaugh, the court stated "we do not believe that any showing of necessity can be made *under the circumstances of this case* so as to justify production," *id.* at 512, 67 S.Ct. at 394 (emphasis added),

and indicated that the relevant information could be obtained by alternative means, including interviews with the witnesses themselves.

The Court repeatedly stressed, however, that discovery of the type of materials sought by petitioner was not absolutely precluded. At one point the Court declared:

> We do not mean to say that all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases. Where relevant and non-privileged facts remain hidden in an attorney's files and where production of those facts is essential to the preparation of one's case, discovery may properly be had.

*Id.* at 511, 67 S.Ct. at 394. At a later point, referring to the denial of production of both the oral statements and the signed statements, the Court reiterated this position:

> Denial of production of this nature does not mean that any material, non-privileged facts can be hidden from the petitioner in this case. He need not be unduly hindered in the preparation of his case, in the discovery of facts or in his anticipation of his opponents' position.

*Id.* at 513, 67 S.Ct. at 394. The Court went on to suggest how petitioner could obtain this information, which included the interviewing of witnesses. Clearly the Court was not confronted with, nor did it consider, those circumstances in which the only possible source of the relevant and non-privileged facts is the attorney's written notes of interviews with witnesses.

Subsequent to *Hickman*, and prior to the adoption of the present Rule 26 in 1970, several courts had the opportunity to consider the question of whether attorneys' notes of interviews are discoverable. The thrust of their decisions is that the notes are not absolutely immune from discovery, and that production is necessarily dependent upon the particular facts of the case. Thus, for example, in McCullough Tool Co. v. Pan Geo Atlas Corp., 40 F.R.D. 490 (S.D. Tex. 1966) defendant demanded production of "notes made by counsel for plaintiff concerning meetings held between plaintiff's president and/or attorneys and Scherbatskoy and/or his attorney." Plaintiff objected on the grounds that the notes contained mental impressions, theories and conclusions of counsel. The court, acknowledging that the notes might contain mental impressions, theories and conclusions of plaintiff's counsel, stated:

> The principal thrust of these documents concerns Scherbatskoy's relationship with plaintiff and not any attorney's work product which may also be included. Pan Geo-Development's attempted discovery is not aimed at the mental impressions, theories and conclusions of plaintiff's counsel. The parties in this suit allege double dealings and fraud against each other, Pan Geo-Development alleges secret tortious dealings between plaintiff and Scherbatskoy. In all of these documents, Pan Geo-Development seeks to explore the relationship and dealings between plaintiff and Scherbatskoy. Evidence of these dealings is highly relevant to the issues of this case. That these documents may also contain mental impressions, theories and conclusions of counsel is of secondary importance, and any fortuitous inclusion of attorneys' work product will not defeat discovery of the dealings between plaintiff and Scherbatskoy.

*Id.* at 493–494.

And, in Caruso v. Moore-McCormick Lines, Inc., 196 F. Supp. 675 (E.D.N.Y. 1961), respondent moved for the production of statements of witnesses taken by libellant's attorney on the ground that the witnesses refused to cooperate with the respondent. The libellant opposed the application on the ground of attor-

ney's work product. The court stated that *Hickman* did not

> support the proposition that a statement of a witness taken by an attorney is clothed in the mantle of "work product"; otherwise statements heretofore taken by agents or investigators would be entitled to the protection of Hickman by the simple process of permitting the attorney to take the statements.

*Id.* at 676.

And finally, in Sharon Steel Corp. v. Travelers Indemnity Co., 26 F.R.D. 113 (N.D. Ohio 1960), plaintiff sought production of memoranda prepared by the general counsel of Westinghouse Electric Corporation (the third-party defendant) as a result of two meetings held between officers of Westinghouse and the president of Sharon Steel. At those meetings, Sharon Steel's president made certain remarks concerning his understanding of the relationship between the parties present; and it was important for plaintiff to know what its president said. The problem developed because of the president's failure to remember his statements, and because no record, other than the memoranda in question, existed. The court, stating that the "Federal Rules were established to take the guesswork out of trials, not add to it," and that the " 'ultimate aim of . . . a lawsuit is that it be a search for the truth,' " *id.* at 115, quoting Hayman v. Pullman Co., 8 F.R.D. 238, 239 (N.D. Ohio 1948), held that plaintiff had established good cause and ordered production of those portions of the memoranda that contain either the verbatim or "in substance" remarks of Sharon Steel's president. [5]

IBM has cited two post-*Hickman*, pre-1970 cases which it contends supports its proposition: Wild v. Payson, 7 F.R.D. 495 (S.D.N.Y.1946) and Virginia Metal Products Corp. v. Hartford Accident & Indemnity Co., 10 F.R.D. 374 (S.D.N.Y.1950). Neither of these cases can be considered apposite. In *Wild*,

---

5. For other pre-1970 cases which discuss the extent of the attorney's work product privilege as delineated by Hickman, *see* Kearney & Trecker Corp. v. Giddings & Lewis, Inc., 296 F. Supp. 979 (E.D. Wis. 1969) (production of attorney's work product ordered); Burke v. United States, 32 F.R.D. 213 (E.D. N.Y. 1963); Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 211 F. Supp. 736 (N.D. Ill. 1962) (production of attorney's work product denied because party seeking showing of production failed to establish sufficient showing of good cause); Snyder v. United States, 20 F.R.D. 7 (E.D.N.Y. 1956) (production of statements of witnesses taken by others for the use of defendant's counsel denied because plaintiff did not establish good cause; indeed, the court's opinion clearly indicates that the witnesses had not been interviewed by plaintiff); Lundberg v. Welles, 11 F.R.D. 136 (S.D.N.Y. 1951) (production ordered of all statements, reports and memoranda of two witnesses given to defendant, its attorneys, agents, or employees); and United States v. United Shoe Machinery Corp., 89 F.Supp. 357 (D. Mass. 1950) (in which Judge Wyzanski stated "there is no privilege for so much of a lawyer's letter, report or opinion as relates to a fact gleaned from a witness . . . ." *Id.* at 359). In the *Lundberg* case, *supra*, which involved the alleged infringement of plaintiff's copyright on his book by RKO Radio Pictures, Inc., the court found that the statements given to defendant's attorneys constituted "narrations of the witnesses' activities in the course of the preparation and writing of the scripts," and as such, did not constitute work product. *Id.*, 11 F.R.D. at 138. And in Kearney & Trecker Corp., *supra*, the court held that *Hickman* did not confer an absolute privilege upon an attorney's work product. After noting that the Supreme Court, in *Hickman*, found that attorney Fortenbaugh failed to demonstrate sufficient need or justification for production of "written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties," 329 U.S. at 510, 67 S.Ct. at 393, the district court concluded that the Supreme Court "did not mean . . . that all written materials obtained or prepared by a lawyer with an eye toward litigation are necessarily free from discovery in all cases;" and that production was necessarily predicated upon the establishment, by the party seeking discovery, of adequate justification for the information. 296 F. Supp. at 981–982.

plaintiff's attorney interviewed a witness. As to some statements, the attorney had his stenographer record the witness' remarks; as to other statements, the attorney wrote out his own notes. Defendant only sought production of the stenographer's typed copy of the witness' statements. The court ordered production on the theory that the *information sought was not privileged.* The court then stated that the notes made by the attorney would be privileged, *but did not discuss whether the notes would be discoverable since the defendant did not ask for the notes.*

*Virginia Metal Products Corp.* did not involve attorney's work product, but rather involved investigative reports of interviews with witnesses. Although not on point, it can be argued that the opinion represents judicial thinking on the subject of notes of interviews. Plaintiff had demanded "reports of investigator's 'as to interviews with Taylor, Lazarus or any other person which would tend to show the dishonesty of Taylor.'" 10 F. R.D. at 376. The court, stating that the reports contained "the writer's impressions of and conclusions about persons interviewed, and his recollections of their statements," *id.*, and citing *Hickman,* denied production without articulating the reasons for its decision. The court did order, however, production of actual statements of witnesses in their own language, and the names and addresses of all witnesses. Although there was no discussion of the plaintiff's reasons for demanding the notes, it is clear that plaintiff had not exhausted all possible means of obtaining the information desired. Thus, to the extent that the court's reasoning was based upon plaintiff's failure to make a good cause showing, its reading of *Hickman* comports with this court's; but, to the extent that the court in *Virginia Metal Products Corp.* implicitly adopted the concept that all notes of interviews, attorney's or others, are absolutely privileged, this court believes that neither

*Hickman* nor its progeny mandate such a construction. *See, e. g.,* People v. United States, 27 F.R.D. 261 (N.D.Cal. 1961) in which the court, referring to investigative reports, stated:

> it generally is made by an investigating agent acting in other than a legal capacity, where it contains material in the nature of opinion, theory, or recommendation, made either by witnesses or the investigator, such document or report partakes of the nature of an attorney's notes in preparation of his case, and production of such material should, therefore, be conditioned upon a strong showing of necessity.

*Id.* at 262.

 It is therefore apparent that the basic thrust of *Hickman* and its progeny is that documents containing the work product of attorneys which contain the attorneys' thoughts, impressions, views, strategy, conclusions, and other similar information produced by the attorney in anticipation of litigation are to be protected when feasible, but not at the expense of hiding the non-privileged facts from adversaries or the court. Both sides of a suit need to know the facts in order to properly present their case to a court; and the court needs to know the facts in order to make a sound and intelligent decision. Thus, the right of privacy of an attorney's notes must be balanced against the critical need for the facts. Where the non-privileged facts are intertwined with information which conceivably is privileged, the critical factor becomes the availability of the non-privileged facts from other sources; and where no other sources exist, then a balance must be struck in favor of distilling, if possible, the non-privileged facts from the attorney's documents. If such a distillation becomes impossible, however, then the entire contents of the documents must be produced. This is especially true where one party has control over the information sought. A party should not be allowed to conceal critical, non-privileged, dis-

coverable information, which is uniquely within the knowledge of the party and which is not obtainable from any other source, simply by imparting the information to its attorney and then attempting to hide behind the work product doctrine after the party fails to remember the information. Thus, the court believes that the information can be turned over to the requesting party while at the same time protecting, as best as possible, the attorney's mental impressions, conclusions, opinions and legal theories, by having the court review the documents and excise, if feasible, privileged information.

■ Turning to the facts of the instant case, the court believes that Xerox has clearly made a sufficient showing of substantial need and undue hardship and therefore is entitled to some of the Galbi notes. One aspect of this case involves Xerox's claim that IBM misappropriated Xerox trade secrets during the course of IBM's development of its commercial copier; and one of IBM's defenses to this allegation is that the copier marketed by IBM is a result of IBM's own research, design and development. In order to determine whether or not the IBM copier was based upon Xerox's trade secrets, it is necessary to know among other things who within the IBM organization had access to the Xerox trade secrets; the extent of those IBM employees' knowledge and understanding of the Xerox trade secrets; whether or not employees with knowledge of the Xerox trade secrets participated in the IBM copier program; and the extent to which Xerox trade secrets were used in the IBM copier program. This information is obviously within the IBM organization and is known to IBM. Indeed, according to the Galbi affidavit, Galbi believed that the employees who communicated with him did so at the instruction of their superiors within IBM. Xerox has attempted, without success, by traditional methods to obtain this in-

formation from IBM. Now Xerox is attempting to obtain the information from the only remaining source, the Galbi notes; but IBM is resisting on grounds of work product. The court views IBM's actions as an attempt to hide behind this privilege in order to prevent Xerox from getting the facts to which it would otherwise be entitled. Therefore, in order to eliminate this inequity, the Galbi notes of the 23 witnesses who were interviewed by Galbi and who were deposed by Xerox but who were unable to furnish any information to Xerox shall be made available to Xerox. This is to be accomplished in the following manner. IBM is to produce the notes to the court so that the court might determine which portions, if any, of the notes are privileged and can be protected from disclosure. After reviewing the notes and making any deletions which the court deems to be appropriate, the expurgated version of the notes shall be turned over to Xerox.

■ As to the Galbi notes of the 14 persons who have not yet been deposed by Xerox, the court does not believe that Xerox has made a sufficient showing. However, if Xerox should attempt to depose these persons, and if their recollections are no better than the recollections of the other group, the Galbi notes of the interviews of these 14 witnesses, upon proper application to the court by Xerox, shall be turned over to Xerox in accordance with the above procedures.

So-ordered.

## APPENDIX A

### SPECIAL MASTER'S REPORT AND RECOMMENDATIONS

This report is made pursuant to Special Master Orders Nos. 1 and 2 entered by Chief Judge Edelstein and sets forth the Special Master's recommendations concerning various pre-trial discovery disputes and is accompanied by a proposed Order for the approval of the Court.

*IBM Demand For Production Of Previously Produced Documents By Xerox To The FTC and SCM*

IBM demands the production by Xerox of some 75,000 pages of documents contained in "21 cartons of documents previously produced by Xerox to the FTC and SCM." IBM contends that it is entitled to production of the entirety of the contents of these cartons. Further, IBM states that to the extent that some of the materials contained in the cartons contain confidential information IBM would be willing, in the first instance, to peruse the documents on a "counsel only" basis. (12/19/73 IM, p. 16 [1]).

IBM bases its claim upon its right to peruse all documents relating not only to IBM's unenforceability defense (improper patent acquisition, licensing and enforcement policies) but also upon IBM's right to have discovery directed at defending against specific Xerox averments in the amended complaint with respect to Xerox's commercial activities. (See *e. g.*, 12/19/73 IM pp. 15–17).

Xerox responds by stating that (1) the majority of the documents produced to the FTC and SCM relate to marketing practices and therefore are totally irrelevant to the issues in the pending action (1/3/74 XM pp. 20–21); and (2) that the material requested includes highly sensitive future product planning and information (1/3/74 XM p. 21). Xerox states that substantially all of the documents contained in the FTC collection relating to patent acquisition, enforcement and licensing have been produced to IBM (during the first half of 1973) and also, that after a careful review of the documents pursuant to a discovery compromise agreement in September 1973, approximately 300 further documents were produced to IBM (1/3/74 XM p. 21). Xerox also contends that any information necessary to IBM to rebut allegations in Xerox's

complaint is fully available from published documents or other documents previously produced to IBM (1/3/74 XM p. 22).

In response to Xerox's claim of irrelevancy and confidentiality IBM states that materials now possessed by IBM make it clear to IBM that the production to date "could not have possibly been a complete production" (12/31/73 IM p. 29). Secondly, IBM argues that while the second issue in the FTC proceeding is different from the subject matter of this lawsuit, the materials produced to the FTC would, if not bearing on the patent misuse issue, bear on the affirmative averments contained in Xerox's amended complaint (listed at pages 32 through 33 of IBM's 12/31/73 memorandum). IBM states that:

> "the net of these averments is that there may well be issues between the parties with respect to the competitive situation between plain paper xerographic office copiers and other copiers. IBM is entitled to discovery with respect to these issues." (12/31/73, IM p. 34).

Thus IBM argues that given its willingness to subscribe to a protective order and to review the production, at least in the first instance, on a counsel only basis, Xerox should comply with the production request. IBM also refers to a Xerox Corporation answer to objections filed in another action in which Xerox stated as a reason for production, that a protective order would protect against a client obtaining advantageous competitive materials.

There is no assertion by Xerox of an objection by reason of burdensomeness. Indeed, any burdensomeness would appear to be voluntarily assumed by IBM.

It is concluded that, given the affirmative averments in Xerox's complaint, IBM's patent unenforceability defense and Xerox's prior disclosure to third

---

1. References to IBM memoranda will be to —/—/— IM p. —.

References to Xerox memoranda will be to —/—/— XM p. —.

parties, IBM should have available to it, on a counsel only basis, the 21 cartons previously produced to the FTC and SCM. Counsel for IBM should subject themselves to a protective order barring in the first instance any disclosure to their clients of any designated confidential materials contained in such production.

*Applicability Of The Order Issued By The Honorable Edward C. McLean On February 9, 1972*

On February 9, 1972, Judge McLean entered an Order providing in relevant part as follows:

"3. \* \* \* In the event that plaintiff believes that any document (other than an unissued patent application or an amendment) called for . . . is within the attorney-client privilege or is attorney's work product, plaintiff shall list and produce for inspection such document in accordance with the provisions of ¶ s 7 and 8 hereof."

"7. With respect to any document which plaintiff contends is within the attorney-client privilege or is attorney's work product, and which is called for by an IBM Interrogatory which plaintiff is hereby ordered to answer, plaintiff shall:

(a) Serve a list of all documents called for by such IBM Interrogatories and which plaintiff contends are within the attorney-client privilege, and at the same time, plaintiff shall make available for inspection by defendant's counsel each such document in accordance with the proposed Stipulation and Order annexed hereto as Exhibit B and which shall be signed by counsel and filed forthwith.[2]

(b) Serve a list of all documents called for by such IBM Interrogatories and which plaintiff contends are or constitute attorney's work product

in accordance with the provisions of the proposed Stipulation and Order referred to in sub-paragraph (a) above.

"8. Each such list served by plaintiff in accordance with the provisions of paragraph 7 above shall state with respect to each such document listed, to the extent known to plaintiff:

(a) a general description of the document (letter, report, memorandum, etc);

(b) the date the document bears, or the date the document was originated or received;

(c) the full name of each author, sender or originator of the document;

(d) the full name of each recipient or addressee of the document; and

(e) the residence address, business address and job title of each person named in connection with sub-paragraphs (c) and (d), whether or not such person is a member of any bar."

The foregoing Order was entered in 70 Civ. 1596 and judged solely by its terms has no applicability to the '73 action.

IBM argues that the production governed by Judge McLean's Order should be continued with respect to all documents in both the '70 and the '73 actions, because 1) the Order by its terms was prospective at least as to the '70 action and 2) logic demands that the terms of the Order be applied to the 1973 action as well (12/19/73 IM pp. 18–19).

Xerox strongly disagrees. By letter dated December 21, 1973, Mr. Carr states that

" \* \* \* I am quite certain that whether or not Judge McLean's Order be determined to be the rule of the case for the 1970 Action, it cannot be, without more, the rule of the case for the 1973 Action.

---

2. The Stipulation and Order were signed by Counsel, and So Ordered by Judge Metzner on March 7, 1972.

"I feel very strongly about the concept of attorney-client privilege, and indeed work product to the extent that that may be involved."

Xerox states that the March 7, 1973 Stipulation and Order in which it "agreed" to produce to IBM privileged documents could not possibly refer to any documents relating to licensing as the issue of licensing was at the time subject to a pending motion under Rule 42 to sever and stay for later discovery and trial. Therefore, Xerox argues it could not have agreed to produce any documents covered by its Rule 42 Motion. Using similar logic Xerox argues that it could not have agreed to produce documents not yet found in Xerox files (1/3/74 XM pp. 22–24).

IBM responds that the February 9, 1972 Order required Xerox to produce documents relating to "policies and practices with respect to licensing or not licensing patents" and "policies and practices with respect to applying for and prosecuting patents . . . ." (1/18/74 IM p. 19 February 9, 1972 Order ¶ 1). IBM states that the pendency of a Rule 42 Motion to Sever had and could have had absolutely no bearing on the February 9th Order (also noting that the motion was denied and that after the denial of said motion, Xerox in fact began producing to IBM "licensing" documents).

It would seem that the very terms of Judge McLean's Order required both Xerox and IBM to produce to one another documents relating to the 1970 action withheld solely on the ground of attorney-client privilege and to list documents withheld on the grounds of attorney's work product. Xerox arguments to the contrary notwithstanding, the language of the specific interrogatories covered by Judge McLean's Order require the production of documents relating to licensing, whether or not discovered at the time of the Order, or whether or not such documents were the subject matter of Xerox's Rule 42 Motion. Both parties should be ordered to comply

with the production methods outlined in Judge McLean's Order as to the 1970 action.

However, Xerox's argument that Judge McLean's Order has no applicability to the 1973 action has merit, for surely an Order entered in the 1970 case cannot, without more, be applicable to an action begun in 1973. Thus, Xerox argues if it were subjected to the terms of Judge McLean's Order in the 1973 action it would be subjected to an "involuntary production . . . of documents as to which it has a proper claim of privilege contrary to proper discovery procedures." (1/3/74 XM p. 24). IBM responds to this argument by stating that both logic and expedition will be served by extending Judge McLean's Order to the 1973 action. While it may well be that expedition will indeed be served by such production, Xerox should have the opportunity to present argument as to documents relevant solely to the 1973 action as to which it claims privilege, prior to a turn-over of such documents even on a "counsel only" basis. (IBM at this time does not demand a turn-over schedule in the 1973 action as to privileged documents. It states that "because of the germinal stage of discovery in that action, the schedule should be tied to the due date (currently, March 19, 1974) for the bulk of the reponses to each party's interrogatories and requests for documents)."

An Order should be entered, therefore, adopting the following schedule as to "privileged" and "work product" documents subject to the terms of Judge McLean's Order and relevant to the 1970 action:

Friday March 15 (1) The parties to exchange three (3) copies of all relevant documents still withheld in the 1970 action on the ground of "privilege" but not "work product".

(2) The parties to exchange the customary information concerning such documents (*i. e.*, dates, identity of au-

thors, recipients and participants in meetings, etc.).

(3) The parties to exchange lists of all relevant documents withheld in the 1970 action on the ground of "work product" and not previously listed, including the customary information concerning such documents.

Friday March 29 The parties to exchange notices concerning "privileged" and "work product" documents as to which each intends to press for unrestricted production in 70 Civ. 1596.

Friday April 12 (1) The producing party to submit to the Special Master *in camera* one (1) copy of each "privileged" and "work product" document as to which unrestricted discovery is sought by the receiving party in 70 Civ. 1596.

(2) The parties to submit to the Special Master and to exchange memoranda in support of their respective contentions.

Friday April 26 The parties to submit to the Special Master and to exchange answering memoranda.

### Production By IBM Of The "Galbi" Notes

In early 1970, Mr. Elmer Galbi, an in-house attorney for IBM began an investigation, pursuant to instructions by his superiors, aimed at determining the path alleged Xerox trade secrets had taken through the IBM organization (Transcript p. 23, Dec. 20, 1973 Hearing Before Special Master).[3] During the course of his investigation Mr. Galbi interviewed 37 IBM employees and took notes of these interviews. Xerox has demanded and IBM has refused production of these notes.

IBM bases its refusal on the grounds that Mr. Galbi's notes are "privileged" and that they are protected by the "work-product" rule. (1/18/74 IM p. 14). It states first that the notes in question "contain and comprise" the " 'mental impression, conclusion, opinions, or legal theories, of an attorney . . . of a party concerning the litigation' " (1/18/74 IM p. 15) and are therefore absolutely immune from discovery. Secondly, IBM argues that even if the notes were not absolutely immune from discovery by reasons of their nature, Xerox has failed to make the showings of "substantial" necessity and "undue hardship" required for the discovery of work product under Rule 26(b)(3) (1/18/74 IM p. 16). Lastly, IBM states that Mr. Galbi's notes are privileged under the attorney-client privilege (1/18/74 IM p. 14).

Xerox argues that though the Galbi notes were prepared by an attorney in anticipation of litigation, Xerox has shown the substantial need and undue hardship required by the language of Rule 26(b)(3) to allow disclosure of said notes. Xerox further argues that those persons supplying the material for the Galbi notes were "witnesses" and not "clients" so that no attorney-client privilege may be invoked under the applicable case law (1/3/74 XM pp. 8–13).

Finally, to meet IBM's statement that the notes "contain and comprise" the mental impressions or legal theories of an attorney Xerox proposes that the notes be submitted to the Special Master for appropriate masking and that Xerox then be given access to the factual material contained therein (1/3/74 XM p. 13).

We turn first to IBM's claim of attorney-client privilege. In the affidavit of Mr. Ford submitted in support of Xerox's argument against privilege, Mr. Ford states:

"On information and belief, many if not all of the witnesses interviewed by Mr. Galbi were, with the exception of attorneys Brown, Madden, and McTierneiss, engineering or scientific employees engaged in research and de-

---

3. Hereinafter cited as 12/20/73 Tr. p. ——.

velopment work at IBM and were not in a position to control or take a substantial part in the decision making processes of IBM." (Affidavit of Frank W. Ford dated 1/3/74).[4]

IBM does not refute this allegation in its briefs. (Indeed IBM has not, beyond the assertion that the privilege exists, submitted any argument in support of its position as to privilege.)

Thus, upon the facts as submitted, the Special Master is seemingly called upon to decide whether one or another of two theories of corporate attorney-client privilege is to apply to the bulk of Mr. Galbi's notes.

In City of Philadelphia v. Westinghouse Electric Corp., 210 F.Supp. 483 (E.D.Pa.1962) the Court discussed privilege in the following manner:

"Now, in cases where an employee of a corporation in an executive or managerial position communicates a fact relative to pending litigation to a lawyer retained or employed by the corporation, the question frequently arises: When he does so, is the corporation seeking the advice of the attorney? In other words, was he at the time, in contemplation of law, the corporation seeking advice? If not, then he was giving the lawyer information in order that the latter could advise a client other than himself. In such case the employee is merely a witness and I think that Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451, settles the question that a statement given by a witness to a lawyer who is collecting information in order to prepare for litigation pending against the lawyer's client is not privileged although it may be within the ambit of the 'work product' principle; and it is very important to keep in mind the fact that the work product principle is not and cannot properly be described as a privilege. Some Courts have confused the situation by calling it a qualified privilege, but it is not a privilege at all; it is merely a requirement that very good cause be shown if the disclosure is made in the course of a lawyer's preparation of a case.

\* \* \* \* \* \*

"Keeping in mind that the question is, Is it the corporation which is seeking the lawyer's advice when the asserted privileged communication is made?, the most satisfactory solution, I think, is that if the employee making the communication, of whatever rank he may be, is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a body or group which has that authority, then, in effect, he is (or personifies) the corporation when he makes his disclosure to the lawyer and the privilege would apply. In all other cases the employee would be merely giving information to the lawyer to enable the latter to advise those in the corporation having the authority to act or refrain from acting on the advice."

This position has been accepted by several courts (see cases cited in § 2017, n. 95 Federal Practice and Procedure C. A. Wright and A. B. Miller, 1970), and has been cited by courts of this district. Technograph Inc. v. Texas Instruments Inc., 43 F.R.D. 416, 419 (S.D.N.Y.1967).

A different view, however, was taken by the Court of Appeals for the Seventh Circuit in Harper and Row Publishers, Inc. et al. v. Decker, 423 F.2d 487 (7th Cir. 1970) aff'd by equally divided court, 400 U.S. 348, 91 S.Ct. 479, 27 L. Ed.2d 433 (1971):

"Judge Kirkpatrick's control group test has been applied by other courts. E. g., Natta v. Hogan (10th Cir., 1969), 392 F.2d 686, 692; Garrison v. General Motors Corp. (S.D.Cal., 1963),

4. Hereinafter Ford Aff.

213 F.Supp. 515. It has been criticized. Burnham, Confidentiality and the Corporate Lawyer: The Attorney-Client Privilege and 'Work Product' in Illinois, 56 Ill.B.J. 542, 545–48 (1968); Heininger, The Attorney-Client Privilege as it Relates to Corporations, 58 Ill.B.J. 376, 384 (1965). Broader tests have been suggested. See Pye, Fundamentals of the Attorney-Client Privilege, 15 Prac.Law. 15, 19 (Nov. 1969); Maurer, Privileged Communication and the Corporate Counsel, 28 Ala.Law. 352, 375 (1967); D. I. Chadbourne, Inc. v. Superior Court (1964), 60 Cal.2d 723, 36 Cal. Rptr. 468, 388 P.2d 700, 709.

"We conclude that the control group test is not wholly adequate, that the corporation's attorney-client privilege protects communications of some corporate agents who are not within the control group, and that in those instances where the order here under attack must rest entirely upon the control group test, the order is unlawful.

"It is clear that we are not dealing in this case with the communications of employees about matters as to which they are virtually indistinguishable from bystander witnesses; employees who, almost fortuitously, observe events which may generate liability on the part of the corporation. We express no opinion with respect to communications by employees who fall in that class.

"We conclude that an employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's attorney is privileged where the employee makes the communication at the direction of his superiors in the corporation and where the subject matter upon which the attorney's advice is sought by the corporation and dealt with in the communication is the performance by the employee of the duties of his employment." (423 F.2d 491–492)

Under the *Harper and Row* test we would be thus obliged to determine 1) if the material in question was furnished to the attorney at the direction of the employee's superiors and 2) if the subject matter of the advice sought by the corporation is the performance of the duties of his employment.

While the Special Master is inclined to accept the formulation of the *Harper and Row* case, there has not been provided sufficient data as to each of the interviewees for the Special Master to make an informed judgment on that basis.

However, as has been previously noted in detail, both parties, at least as to the 1970 action, are subject to the February 8, 1972 Order of Judge McLean. Paragraph 9 of that Order states:

"9. At the time that plaintiff serves the lists referred to in paragraphs 7 and 8 above, defendant shall serve two similar lists of its documents which defendant contends are within the attorney-client privilege or are or constitute attorney's work product, and at the same time, defendant shall make available for inspection by plaintiff's counsel defendant's documents allegedly within the attorney-client privilege, on the same terms and conditions as defendant's counsel's inspection of plaintiff's allegedly attorney-client privilege documents provided for in paragraphs 7 and 8 above."

IBM has vigorously argued that Judge McLean's Order should be the basis for production of "privileged documents" (1/18/74 IM pp. 18–24). IBM also argued that production of privileged documents was fully justified in view of past procedures and in view of the protection afforded by Judge McLean's Order and the March 7, 1973 Stipulation of the parties. IBM should therefore be held to the standard it seeks to apply to

Xerox and should thus be ordered to make available to Xerox for inspection those portions of the Galbi notes withheld solely on the grounds of privilege.

Mr. Ford's affidavit states that Xerox has deposed 23 of the 37 witnesses interviewed by Mr. Galbi. Such depositions have been taken, Mr. Ford states, "to show the flow of Xerox trade secret information from those IBM employees who originally obtained it in connection with joint Xerox-IBM xerographic projects to those IBM employees who used it in the IBM office copier program." (Ford Aff. p. 2). Mr. Ford also states that the witnesses deposed generally had an inability to recall the Xerox documents to which they had access and to recall the use made of information contained in Xerox "trade secret" documents (Ford Aff. p. 2).

Finally, Mr. Ford points out that the notes taken by Mr. Galbi reflect memories of the witnesses recorded over 3½ years ago (Ford Aff. p. 3) and that they thus record thoughts less dimmed by time.

I find that Xerox has made a sufficient showing of substantial need and undue hardship as to each section of the Galbi notes relating to the witnesses whose depositions have been taken. (See United States v. Murphy Cook & Co., 52 F.R.D. 363 (D.C.Pa.1971). As to these notes, IBM shall be required to produce them to the Special Master on or before March 15, for a determination as to what portions thereof constitute the mental impressions or legal theories of Mr. Galbi. (IBM may submit a memorandum on that date to the Special Master arguing the nature of each portion of the Galbi notes it deems exempted from the requirements of Rule 26(b)(3) by the second sentence thereof.)

After such determination, said documents will be produced to Xerox under the terms of the March 7, 1972 Stipulation protecting attorney-client privilege.

As to those witnesses not yet deposed by Xerox, I find that Xerox has not shown sufficient hardship in gathering the information by alternative means and I decline to order production at this time. (See § 2025 Federal Practice and Procedure, C. A. Wright and A. B. Miller, 1970 and n. 72 thereto for cases denying discovery when witnesses are available for deposition.)

*IBM's Refusal To Permit Answers To Deposition Questions Involving Allegedly Confidential Information*

In its January 3, 1974 memorandum Xerox states that "witnesses were prevented from giving any answers regarding activities in Xerography unless directly relating to marketed products." (XM 1/3/74 p. 4) Xerox claims that contrary to IBM's contentions, any use by IBM of Xerox trade secret information (excluding use in data processing) is a misuse of that information and is therefore relevant to both the 1970 and 1973 actions. Xerox contends that by the misuse of Xerox trade secret information IBM could avoid years of research and exploratory effort in connection with unmarketed products by referring to the Xerox trade secret information. This Xerox argues is true whether or not product has been or may be marketed commercially and whether or not the claim is for misuse of trade secrets or is based on patent infringement.[5] Further Xerox claims that it has already identified to IBM the trade secret information disclosed to IBM which is the subject of both the 1970 and 1973 actions (XM 1/3/74 pp. 4–5).

In its December 19, 1973 memorandum IBM objects to Xerox's attempts to elicit information from IBM witnesses in the 1973 action concerning IBM re-

---

5. Xerox states that as far as the patent infringement claims are concerned, "[a]ny unauthorized use of patented apparatus or process is infringement." (XM 1/3/74 p. 6).

search and development activities occurring after April 21, 1970 (the purported cut-off date for discovery in the 1970 action) unrelated to the manufacture of the IBM "Copier II" or to any other product marketed by IBM. IBM states that such discovery attempts are improper as they seek information not relevant to the subject matter of the action: information which is highly confidential and of large competitive value and which additionally would be burdensome and prejudicial for IBM to produce. (IM 12/19/73 p. 27) Further, IBM states that contrary to Xerox's assertion Xerox has not yet particularized the "trade secrets" upon which it relies in the 1973 action and that Xerox must first do so prior to obtaining answers to questions designed to trace the use of these secrets through the IBM organization.

In support of its statement that IBM has hindered Xerox's attempts to elicit relevant information Xerox annexes excerpts to the depositions of Dr. Triebwasser and Mr. Rice. In the Triebwasser deposition, for example, the following exchange took place:

"Q. Did your discussion at Lexington at that time relate in any way to display devices contemplated for use with IBM copiers?

"MR. HERMAN: Objection.

"I advise the witness not to answer.

"MR. MacBLAIN: Mr. Herman, for the purpose of this deposition, I am perfectly willing to seal the record in connection with this witness' testimony in relation to his work, or his visit to Lexington that we've been discussing, and I think this would be in accordance with our stipulation of October 24, 1973, under which we've been receiving documents that have gone, I believe, beyond the grounds which you have stated as your basis for objection at this time.

"MR. HERMAN: Well, first of all, Mr. MacBlain, your statement about the documents isn't quite accurate.

"It is my understanding that the production of documents made under that agreement between counsel covered only documents produced in the 1970 action, and there was a cut-off date for discovery in that of April 21, 1970.

"So that, to that extent, the analogy isn't correct.

"Number two, you have asked the witness about office copiers, and he said no. And this isn't a free-roaming interrogation. It has to be directed to something that is in issue in this lawsuit. And the issue in this lawsuit is office copiers, in the 1970 action.

"In the 1973 action, the issue, as I understand it, at least, is the Copier II. At least that is the position that we are, and have been, taking. And it is the Copier II as announced.

"And to the extent that this witness can testify about his understanding of the development of the Copier I, he is free to do that. And to the extent that he can testify about the development of the Copier II, I think, in light of yesterday's proceedings, he is probably entitled to do that. But beyond that, I think that we're going to block it, barring the pronouncement by the Court that we shouldn't.

"MR. MacBLAIN: Well, Mr. Herman, it occurs to me that discussions that this witness may have had with persons involved with the development of either the Copier I or the Copier II, albeit not expressly related to those development programs per se, may well have resulted in information flowing into the development program for those two copiers.

"And on that basis, I think my inquiry is relevant.

"MR. HERMAN: Well, Mr. MacBlain, you have posed what is probably a hypothetical problem, but I will deal with it. And that is that I think, before you can examine the witness in detail, you have got to establish this relevancy. And relevancy isn't the possible flowing in of some information which may or may not have any bearing on this lawsuit.

"What you have got to do is pick some areas of technology that you think Xerox is interested in and move on from there, tell us what your trade secrets are, and then take them one by one, and you can ask this witness whether or not he discussed this technology or that technology.

"But we're not going to have a free-roaming discovery inquiry. If you want to be more specific, if you want to pick something that you deem to be a trade secret—and that you think may be misused—if you want to ask the witness whether he has some information about that subject matter, you are welcome to do it. But I think you have to be more specific as to what kind of information you are looking for before you can examine this witness in the manner in which you are doing.

"MR. MacBLAIN: Well, I will just say, Mr. Herman, that the degree to which I can be specific depends, in large part, upon the subject matter of the discussion of the witness.

"MR. HERMAN: Well, I think that is putting the cart before the horse.

"It seems to me that if you bring out a trade secret—you ought to have some idea what the trade secrets are, and you start with those. And that is what I do. If you can't start with those, we're not going to go anywhere."

In the Rice deposition the following exchange took place:

"Q. You did work on an office copier at that time, which is still not announced?

"A. Still not announced, yes.

"Q. Can you describe the product to us?

"MR. ESTABROOK: I will permit you to answer that question either yes or no, Mr. Rice; and advise you to do so.

"A. Question is can I?

"Q. Yes.

"A. No.

"Q. Are you familiar with the product?

"A. Familiar in what terms?

"Q. Technically.

"A. To what degree?

"Q. To any degree.

"A. Yes.

"Q. To the extent that you are familiar with it, would you describe it?

"MR. ESTABROOK: Mr. Ford, I object. His conduct in this time period is not relevant to the 1970 action.

"With regard to the 1973 action, it is not relevant, there is no basis that it directly involves development of the Copier II.

"There is no protective stipulation regarding the 1973 action, IBM's position on relevancy as to any trade secret misappropriation, unfair competition action is spelled out, first in IBM's objections to your interrogatories 1 through 9, and in correspondence among counsel; confidential character of this information, burden on IBM, it's prejudice; I advise the witness not to answer.

"MR. FORD: I offer to seal this transcript pursuant to the protective

order filed October 24, 1973, specifically the provisions of Paragraph 5 thereof, concerning information designated by IBM, and, if this information is designated in accordance with this protective order, then I will offer to seal the transcript, and any exhibits that may be marked.

"MR. ESTABROOK: Mr. Ford, as I said, this protective order, to be more accurate, stipulation, I don't know whether in fact it has been signed by the Court, and it is now an order, relates clearly to 70 Civil Action 1596. If you will look at Paragraph 1 on the second page, you will see that it refers to documents or information in writing.

"For those two reasons, I am unable to accept your offer. This information is just not relevant to the 1970 action.

"MR. FORD: I thought it was clear that following the hearing last week, questions concerning the trade secret aspects of the 1973 case would be answered.

"So we will have to take this up in Court tomorrow.

"MR. ESTABROOK: Mr. Ford, it is impossible for me to tell what is relevant and what is not relevant with regard to trade secret aspects of the 1973 case.

"MR. FORD: That is our point. Then we can't decide whether or not there are trade secrets involved until we have a disclosure of these so-called unannounced products, and our position, and it always has been our position, is that we are entitled to discovery of them, and, as I say, we will bring it up tomorrow.

"MR. ESTABROOK: That is your prerogative, Mr. Ford. I have stated our position, where our position is spelled out."

Thus it seems that at least in the 1973 action issue is squarely joined as to whether or not Xerox may question IBM witnesses as to (1) activities not directly relating to the IBM "Copier II" [6] and its supplier and (2) activities not directly linked to "trade secrets", identified by Xerox as the basis of its claim.

Xerox's complaint in the 1973 action states that IBM's use of Xerox's "confidential" and "trade secret" information in connection with "the manufacture of commercial copying and duplicating equipment and supplies, including the IBM Copier II and supplies therefore, contrary" to agreements between the parties constitutes an unjust enrichment of IBM. (Complaint ¶ 33, 73 Civ. 3421).

IBM states that it is clear from the pleadings that "IBM's 'manufacture of commercial' copiers is the base on which Xerox rests its claim of trade secret misappropriation." (IM 1/18/74 p. 11). Therefore, IBM states, Xerox is entitled solely to information in the 1973 action

---

**6.** On page 4 of the January 3, 1974 Xerox memorandum reference is made to the compromise of discovery problems between Xerox and IBM in which Xerox agreed that IBM could withhold information regarding data processing activities of IBM on the understanding that IBM would no longer withhold information regarding unmarketed products. Xerox claims that because IBM has not lived up to this agreement Xerox now insists on its rights to investigate all of IBM's activities in xerography.

IBM states that it has fully complied with the understanding reached in September, 1973 and points out that the understandings were reached in connection with the 1970 action and that pursuant to that understanding, IBM has permitted additional discovery. IBM states that it believes that there is no significant dispute between the parties concerning the scope of Xerox's discovery in connection with the "trade secret" aspects of the 1970 action.

Xerox, by letter dated January 22, 1974, states that it does not seek a ruling at this time concerning 1973 patent infringement claims. (Indeed Xerox denies that the Special Master is empowered to render rulings on those claims.) Therefore the Special Master is only concerned at this time with questions to IBM witnesses concerning either unmarketed products or concerning "trade secrets" claimed to be unidentified.

concerning the manufacture of the 1972 IBM Copier II and its supplies (the only copier commercially marketed by IBM during the relevant time period). IBM states that it is willing to supply full information concerning the IBM Copier II as soon as Xerox specified those trade secrets upon which it bases its claim but that no discovery should be allowed as to irrelevant (*e. g.*, unmarketed) products. (IM 1/18/74 pp. 11 and 12).

As noted in IBM's memorandum, the bounds of discovery have been recently staked by Chief Judge Edelstein in His Honor's recent opinion in Mallinckrodt Chemical Works v. Goldman, Sachs & Co., 58 F.R.D. 348, 353, 16 F.R.Serv.2d 1517, 1521 (S.D.N.Y.1973). In his opinion the Chief Judge stated that " 'discovery should be relevant where there is *any possibility* that the information sought may be relevant to the subject matter of the action.' "

It would seem that Xerox should be allowed to conduct its inquiry into the use of Xerox trade secrets whether or not such use is related to the manufacture of the IBM Copier II. As noted above, Xerox's complaint refers to the manufacture of "commercial copying and duplicating equipment" and is not restricted by its language solely to the IBM Copier II. In any case, Xerox should not during this stage of discovery be prevented from fully exploring the use of its "trade secrets" by IBM during the years in question.

This decision does not mean however that Xerox should be free to roam at will through IBM activities and research during the years in question. Basing its claim as it does upon IBM misuse of Xerox "confidential data" and "trade secret" information, Xerox must specify that data and information which forms the bases of its cause of action. Xerox has stated that it has supplied such information to IBM; IBM has denied receipt thereof.

Therefore, Xerox shall be required to furnish counsel for IBM and to the Spe-cial Master by March 15, 1974 a listing of those documents, whether or not heretofore furnished to IBM, which contain or comprise the data and information said to be "confidential data" or "trade secrets" and which form the bases of the Xerox claims in the 1973 action. Once such list has been furnished, IBM shall permit its witnesses to answer questions concerning marketed and unmarketed products which bear any relevance to the materials contained in the list so furnished.

Dated: February 21, 1974.

(s) Lawrence J. McKay
LAWRENCE J. McKAY,
Special Master.