**In re GRAND JURY INVESTIGATION.**

**Appeal of UNITED STATES of America.**

**No. 78–2040.**

United States Court of Appeals,
Third Circuit.

Argued March 21, 1979.

Decided June 1, 1979.

Peter F. Vaira, U. S. Atty., Alfred A. Gollatz (argued), Walter S. Batty, Jr., Bonnie S. Brier, Norman E. Greenspan, Asst. U. S. Attys., Philadelphia, Pa., for appellant.

Barbara W. Mather (argued), William A. DeStefano, David Richman, Jeffery C. Hayes, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellee Sun Co., Inc.

Before SEITZ, Chief Judge, and ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

■ The United States appeals from an order of the district court quashing a grand jury subpoena issued to Sun Company, Inc. The subpoena sought various questionnaires and memoranda compiled by Sun Company and the law firm of Pepper, Hamilton & Scheetz during an internal corporate investigation of various foreign transactions. Although Sun has contested our jurisdiction to consider this appeal, we recently settled this question in *In the Matter of Grand Jury Empanelled February 14, 1978 (Colucci)*, 597 F.2d 851 (3d Cir. 1979). Pursuant to 18 U.S.C. § 3731,[1] the United States Attorney has certified that this appeal "is not taken for the purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." The district court having received this certification, we are not required by section 3731 to evaluate independently the substantiality or the materiality of the contested material. *Compare* 18 U.S.C. § 3731 *with* 28 U.S.C. § 1292(b). *Cf. United States v. Comiskey*, 460 F.2d 1293, 1297–98 (7th Cir. 1972) (United States Attorney need not allege any specific facts in support of his affidavit). We accordingly have jurisdiction to consider this appeal under 18 U.S.C. § 3731 or, alternatively, under 28 U.S.C. § 1291. *See Colucci, supra*, at 854–858.

### I

Although the facts before us are largely uncontested, the record has been impounded to preserve the confidentiality of the grand jury's inquiry. We therefore will refrain from identifying some individuals by name.

---

1. 18 U.S.C. § 3731 reads in relevant part:

An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

In January 1976 Sun Company, Inc., (Sun) began an investigation into possible illegal payments made by some of its employees in connection with Sun's foreign operations. The corporation's Audit Committee, a standing committee of the Board of Directors, supervised the investigation and, on July 20, 1976, reported that no significant violations had occurred.

Late in 1976, however, information submitted by a Sun employee led to a reopening of the investigation. On January 25, 1977, Samuel K. White, Sun's vice-president and general counsel, retained Pepper, Hamilton & Scheetz (Pepper) to advise Sun of its legal obligations in regard to certain payments uncovered during the internal audit. Two days later, the Audit Committee asked Pepper to assist and advise it in the conduct of the investigation itself. The full Board of Directors later ratified Pepper's retention by the Audit Committee and authorized funds for the investigation.

On February 11, 1977, H. Robert Sharbaugh, the chairman of Sun's Board of Directors, sent a covering letter, a questionnaire, and a return envelope to each of 1,877 managerial employees of Sun and its majority-owned subsidiaries. The letter explained the purpose of the investigation and asked the employees to complete the questionnaires and to mail them directly to Pepper. The questionnaire itself contained ten questions probing the employee's knowledge of any suspicious transactions. The instructions accompanying the questionnaire explained that an employee should answer "yes" if he knew of payments like those described in the question, "no" if he didn't, and "conference" if he was uncertain. Neither the questionnaire nor the instructions requested any further elaboration on the answers.

On February 16, 1977, Pepper began to follow up questionnaires containing responses of "yes" or "conference." By September, Pepper had conducted 265 telephone interviews and 90 personal interviews. No interviews were conducted in the presence of anyone except representatives of Pepper and Sun, and, when necessary, an interpreter. The interviews were not transcribed. Instead, the Pepper attorneys reduced their notes and recollections concerning the interviews to memoranda, always within ten days of the actual interview. These memoranda have remained in Pepper's files, and have been released only to members of Sun's Board of Directors.

On September 21, 1977, the Audit Committee filed its report, which discussed a number of transactions deemed "questionable." One of the selected transactions involved the renegotiation of a contract with an entity of a foreign government. Sun had paid a citizen of that country a total of $235,000 for services rendered during the renegotiation of the contract. The Audit Committee found reason to believe that some of the money paid to the foreign representative may have been passed on to governmental officials as an inducement to renegotiate the contract.

The Audit Committee made a number of recommendations in its report, including the amendment of corporate tax returns and the filing of a form 8–K with the Securities and Exchange Commission. On October 27, 1977, Sun did, in fact, file an 8–K with the SEC, disclosing all the questionable payments noted in the report, including the payment of the $235,000 to the foreign representative. This filing prompted an article in the Philadelphia Inquirer and, in turn, an investigation by the United States Attorney for the Eastern District of Pennsylvania.

In a letter dated December 20, 1977, the United States Attorney asked Sun to turn over, *inter alia*, "all documents referring in any way to questionable foreign payments made by Sun, its officers or employees." Sun responded by releasing a number of documents including the Audit Committee report itself. After examining the report, the United States Attorney narrowed the inquiry, requesting all documentation of the renegotiation of the foreign contract and the payment of the $235,000. This request specifically included "all interview memoranda, questionnaires, statements, or other recorded recollections of these events

. . . ." Although Sun released a number of documents pertaining to the affair, it refused to release the interview memoranda or the questionnaires, claiming protection under the attorney-client privilege and the work-product doctrine. On March 21, 1978, Sun received a grand jury subpoena requesting these documents. That request later was amended to allow redaction of those portions of the documents that "would disclose the mental impressions, conclusions, opinions, or legal theories of an attorney." Sun moved to quash the subpoena and the district court granted that motion on June 1, 1978. Although the district judge did not file a written opinion, he indicated at oral argument some of the bases for his conclusions.

Sun has asserted, and the government has not contested, that only thirteen persons provided the Audit Committee with any information regarding the targeted transaction. Eleven of the thirteen were employees of Sun at the time they were interviewed. One of the employees interviewed is now deceased. Except for the deceased employee and the foreign representative himself, who is neither a Sun employee nor a resident of this country, all of the interviewees could be reached by grand jury subpoenas. Although Sun has offered to ensure the appearance of its employees before the grand jury, the government has made no attempt to summon any of the interviewees.

## II

Sun claims that the documents sought in the subpoena are protected by the attorney-client privilege or the work-product doctrine or both. As Sun concedes, the attorney-client privilege cannot protect any communications made by either of the two interviewees who were not employed by Sun. Sun asserts, however, that the work-product doctrine protects all the summoned documents and that this protection is absolute. We therefore consider first the more inclusive of the two alleged shields: the work-product doctrine.

## A

The work-product doctrine, recognized initially in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), protects from discovery materials prepared or collected by an attorney "in the course of preparation for possible litigation." *Id.* at 505, 67 S.Ct. at 391. *See also* Fed.R.Civ.P. 26(b)(3). This doctrine applies in criminal, as well as in civil, litigation. *See United States v. Nobles*, 422 U.S. 225, 236, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). Moreover, the government has conceded in this appeal that the doctrine applies to documents sought by a grand jury. *See In re Grand Jury Proceedings (Duffy)*, 473 F.2d 840 (8th Cir. 1973); *In re Grand Jury Investigation (Sturgis)*, 412 F.Supp. 943 (E.D.Pa.1976).

We must decide three questions in regard to the work-product doctrine. First, were these materials collected or prepared in preparation for possible litigation so as to qualify as "work product"? Second, if they are entitled to protection as work product, is the protection afforded them absolute or qualified? Third, if the documents are entitled to only qualified protection, has the government made an adequate showing to overcome that protection?

## 1

The government asserts that the subpoenaed materials are not entitled to protection as work product because they were not collected or prepared "in the course of preparation for possible litigation." *Hickman v. Taylor, supra*, 329 U.S. at 505, 67 S.Ct. at 391. At the close of oral argument, the district court stated that it would be "difficult" to hold that the investigation was not conducted "in contemplation of litigation." Although this statement, by itself, may be ambiguous, the district court subsequently quashed the subpoena as to all the requested documents. Because Sun based its motion on the attorney-client privilege and the work-product doctrine, and because Sun conceded that the attorney-client privilege did not apply to some of the documents, the conclusion is inescapable that the district court made a factual finding that the work-

product doctrine applied. *Cf. Milliner v. Government of the Virgin Islands*, 593 F.2d 532 (3d Cir. 1979) (oral findings and conclusions held sufficient to "indicate the basis of the trial judge's decision and provide an adequate basis for appellate review"), at 534.

■ Indisputably, the work-product doctrine extends to material prepared or collected before litigation actually commences. On the other hand, some possibility of litigation must exist. Courts and commentators have offered a variety of formulas for the necessary nexus between the creation of the material and the prospect of litigation. *See, e.g., Home Insurance Co. v. Ballenger Corp.*, 74 F.R.D. 93, 101 (N.D.Ga.1977) (must be a "substantial probability that litigation will occur and that commencement of such litigation is imminent"); *In re Grand Jury Investigation (Sturgis)*, *supra*, at 948 (threat of litigation must be "real and imminent"); *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 47 F.R.D. 334, 337 (S.D.N.Y.1969) (prospect of litigation must be "identifiable"); 4 Moore's Federal Practice ¶ 26.63[2.–1], at 26–349 (1970) (litigation must "reasonably have been anticipated or apprehended"). Professors Miller and Wright offer an attractive formulation based on the purpose of the work-product doctrine itself:

> Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.

8 Wright & Miller, Federal Practice and Procedure: Civil § 2024, at 198 (1970) (emphasis added; footnote omitted).

■ Several circumstances in this case convince us that, under any of these tests, the district court reasonably could have found that the prospect of litigation was real enough to mandate work-product protection for the questionnaires and the interview memoranda. First, the investigation concerned suspected criminal violations. When Pepper entered the case, the Audit Committee already had uncovered enough evidence to support "a suspicion of illicit payments having been made." *See* Excerpts of Minutes of Audit Committee, January 27, 1977. If further investigation confirmed that suspicion, litigation of some sort was almost inevitable. The most obvious possibilities included criminal prosecutions, derivative suits, securities litigation, or even litigation by Sun to recover the illegal payments. Moreover, the potential for litigation was immeasurably intensified by Sun's legal obligations to report any wrongdoing to its stockholders and to various governmental agencies. Between 1973 and 1977, the SEC alone commenced 31 actions for injunctions against companies that had allegedly engaged in transactions similar to those suspected by the Audit Committee. *See* Addendum to Brief of Sun Company, Inc.

The prospect of litigation in this case was sufficiently strong to distinguish it from *Abel Investment Co. v. United States*, 53 F.R.D. 485 (D.Neb.1971), and *Peterson v. United States*, 52 F.R.D. 317 (S.D.Ill.1971). Those cases dealt with the discoverability of internal IRS memoranda prepared during the investigatory and settlement phases of a tax audit. In *Peterson* the district court rejected the government's naked assertion that the memoranda were trial preparation materials: "[l]itigation cannot be anticipated in every such case when relatively few result in litigation." 52 F.R.D. at 321. *See also Abel Investment Co. v. United States*, *supra*, at 489–90 (quoting *Peterson*).

The government's other arguments against work-product protection are without merit. The questionnaires and memoranda at issue in this case clearly differ from the statutorily required accident reports held discoverable in *Goosman v. A. Duie Pyle, Inc.*, 320 F.2d 45 (4th Cir. 1963). Furthermore, we perceive no reason to distinguish between Pepper's role as a legal advisor and its role as an investigator. The attorney in *Hickman* acted in a similar dual capacity when he interviewed witnesses.

Under these circumstances we conclude that the district court did not err in holding that Pepper was acting in contemplation of litigation and that the work-product doctrine applies to the questionnaires and the interview memoranda at issue. *But see Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 n.4 (8th Cir. 1977) (affirming district court's refusal to grant work-product protection on similar facts).

### 2

Sun concedes that the work-product protection afforded the questionnaires is qualified and can be overcome by a showing of good cause by the government. As to the interview memoranda, however, Sun asserts that the work-product protection is absolute and that no showing of need by the government can justify enforcement of the subpoena. Sun attempts to draw this rule directly from *Hickman v. Taylor*.

In *Hickman*, the Supreme Court dealt with two types of work product. The defendant's attorney had taken written statements from a number of witnesses at the scene of a tug-boat accident. The Court held that plaintiff's "naked, general demand" for these written statements was insufficient to overcome work-product protection. The burden was on plaintiff "to establish adequate reasons to justify production" of those statements. 329 U.S. at 512, 67 S.Ct. at 394.

Plaintiff also had sought to discover the content of oral interviews with witnesses, some of which interviews had been summarized in memoranda prepared by the attorney. The Court called for greater protection of this information than it had afforded the written statements:

> . . . [A]s to oral statements made by witnesses to [defendant's attorney], whether presently in the form of his mental impressions or memoranda, *we do not believe that any showing of necessity can be made under the circumstances of this case so as to justify production.* Under ordinary conditions, forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account

to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness. No legitimate purpose is served by such production. The practice forces the attorney to testify as to what he remembers or what he saw fit to write down regarding witnesses' remarks. Such testimony could not qualify as evidence; and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and much more an ordinary witness. The standards of the profession would thereby suffer.

329 U.S. at 512–13, 67 S.Ct. at 394 (emphasis added). Citing this excerpt, Sun asserts that the Supreme Court intended to afford the attorney's interview memoranda absolute protection from discovery.

Initially, we note that a few sentences after the quoted passage the *Hickman* Court implied that the protection was less than absolute: "[i]f there should be a rare situation justifying production of these matters, petitioner's case is *not* of that type." *Id.* Nevertheless, at least one court has read *Hickman* as calling for absolute protection of such interview memoranda. In *In re Grand Jury Investigation (Sturgis)*, 412 F.Supp. 943, 949 (E.D.Pa.1976), the court stated that such memoranda "are so much a product of the lawyer's thinking and so little probative of the witness's actual words that they are absolutely protected from disclosure." The Court of Appeals for the Eighth Circuit also has indicated that such memoranda are "absolutely, rather than conditionally, protected." *In re Grand Jury Proceedings (Duffy), supra*, at 848. In the same opinion, however, the Court of Appeals implied that the protection was less than absolute: "[w]e do not believe that the attorney of a prospective criminal defendant, absent unusual circumstances, should be required to produce a summary of a witness's statement . . . ." *Id.* at 848–49.

Apparently, our court already has decided this issue adversely to Sun's position. In *In re Natta*, 410 F.2d 187 (3d Cir.), *cert. denied*, 369 U.S. 836, 90 S.Ct. 95, 24

L.Ed.2d 87 (1969), this court considered the level of protection to be afforded an attorney's memoranda containing "analyses or assessments of [the client's] position with respect to the various parties" in the litigation. The documents contained pure legal opinion. *See id.* at 193. Such material, often called "opinion work product," is the most sacrosanct of all forms of work product. *See, e.g.,* Fed.R.Civ.P. 26(b)(3) (a court must "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney"); Note, *Protection of Opinion Work Product Under the Federal Rules of Civil Procedure,* 64 Va.L. Rev. 333, 334 (1978). Despite the sensitive nature of the materials sought in *Natta,* we did not believe that they were absolutely protected:

> *Hickman* grants to attorney's work product a qualified immunity from discovery . . . . The work product immunity in *Hickman* is definitely limited since a showing of good cause may justify production of documents which otherwise might be protected as work product.

410 F.2d at 192–93. If pure opinion work product is only entitled to qualified protection, we believe that the memoranda at issue here are perforce entitled to no greater protection.

Other courts and commentators also have declined to interpret *Hickman* as clothing interview memoranda with absolute immunity from discovery. *See, e.g., Harper & Row Publishers, Inc. v. Decker,* 423 F.2d 487 (7th Cir. 1970), *aff'd by an equally divided court,* 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971); *Xerox Corp. v. International Business Machines Corp.,* 64 F.R.D. 367, 377–81 (S.D.N.Y.1974); 4 Moore's Federal Practice ¶ 26.63[8], at 26–394, and ¶ 26.64[4], at 26–442 (1970); Note, 64 Va.L.Rev., *supra,* at 339.

■ In declining to afford the interview memoranda absolute protection, we do not hold that they are to be treated identically to the questionnaires. As we noted earlier, quoting Professors Wright and Miller, a demand for discovery of work product must be considered "in light of the nature of the document." 8 Wright & Miller, *supra,* at 198. Memoranda summarizing oral interviews present several unique and well-documented problems to the court which considers their discoverability. First, they may indirectly reveal the attorney's mental processes, his opinion work product. *See, e. g., Hickman v. Taylor, supra,* 329 U.S. at 513, 67 S.Ct. 385; *In re Grand Jury Investigation (Sturgis), supra,* at 949. Second, their reliability as accurate reflections of the witness's statements is a function of many factors, including the conditions of the interview, the contemporaneousness of the writing, and the editorial discretion of the attorney. *See, e.g., Hickman v. Taylor, supra,* 329 U.S. at 512–13, 67 S.Ct. 385. Third, discovery and use of such material creates a danger of converting the attorney from advocate to witness. *See, e.g., United States v. Nobles, supra,* 422 U.S. at 252–53, 95 S.Ct. 2160 (White, J., concurring); *Hickman v. Taylor, supra,* 329 U.S. at 513, 67 S.Ct. 385. Finally, the information contained in such memoranda generally is of limited utility, especially where the witness himself is readily available to the opposing party. *See, e. g., Hickman v. Taylor, supra,* at 513, 67 S.Ct. 385. Although this list is not exhaustive, it does reflect many of the special considerations that must shape any ruling on the discoverability of interview memoranda like those at issue in this case. The result, we believe, is exactly that contemplated in *Hickman*; such documents will be discoverable only in a "rare situation." *Id.*

3

We now must consider whether the government has demonstrated sufficient necessity or "good cause" to overcome the work-product protection of any of the materials sought in the subpoena.

■ As Sun virtually concedes, the government has shown good cause to discover the questionnaire and interview memoranda of Sun's deceased employee. The decedent's earlier recollection of the transaction at issue undoubtedly is relevant to the grand jury's investigation. Moreover,

discovery of this material evokes few, if any, of the concerns enumerated in the prior section. Although the interview memoranda conceivably could contain opinion work product, the government has offered to minimize the intrusion by allowing Pepper and Sun to delete such material from the factual recitation. Because the decedent will not testify, the possibility that the memoranda will be admitted into evidence, and the concurrent possibility that an attorney will become a witness, are remote. Finally, although the memoranda might contain inaccuracies, that possibility must be weighed against the stark inability of the government to secure the information from any more reliable source. Under these circumstances we believe that the government has demonstrated sufficient necessity to overcome the protection afforded the deceased interviewee's questionnaire and interview memoranda.

█ We are not persuaded, however, that the government has demonstrated a similar quantum of necessity in regard to the remaining materials. The government advances three possible bases for a finding of good cause. First, it suggests various reasons why the remaining interviewees might be unavailable or unwilling to testify before the grand jury. But because the government has made absolutely no effort to secure their testimony, the interviewees' unavailability is purely conjectural. All the living interviewees, with the exception of the non-resident alien, can be reached by grand jury subpoenas. Even as to the non-resident alien, we believe that the government should make a reasonable effort to secure his testimony before attempting to invade an attorney's files.

Second, the government argues that the grand jury is investigating not only questionable transactions, but also the possibility of a corporate cover-up of those transactions. This necessitates, according to the government, a determination of "what was stated when to whom." Conceivably, the fact that a witness made a particular statement to an investigating attorney at a particular time might indicate a cover-up and might have relevance apart from the bare facts related in the statement. The government conceded at oral argument, however, that it never filed an affidavit with the district court or otherwise presented a substantiated claim that the grand jury suspected an illegal cover-up. We have only the government's naked assertion that it might discover such a cover-up if granted access to these materials. Given the sensitive nature of the documents subpoenaed, we do not believe that this general, unsubstantiated allegation is sufficient to overcome the protection afforded by the work-product doctrine.

Finally, the government asserts that the grand jury needs the subpoenaed materials to assess the credibility of the various interviewees. This alleged basis for disclosure requires us once again to distinguish between the questionnaires and the interview memoranda. The questionnaires, having been filled out and signed by the employees themselves, are closely analogous to the written statements considered in *Hickman v. Taylor*:

> Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. *Or they might be useful for purposes of impeachment or corroboration.* And production might be justified where the witnesses are no longer available or can be reached only with difficulty. Were production of written statements and documents to be precluded under such circumstances, the liberal ideals of the deposition-discovery portions of the Federal Rules of Civil Procedure would be stripped of much of their meaning.

329 U.S. at 511–12, 67 S.Ct. at 394 (emphasis added). Similarly, were we to deny the grand jury access to written statements under such circumstances, we might impinge on the grand jury's " 'right to every man's evidence,' " *see Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (quoting J. Wigmore, Evidence § 2192 (3d ed. 1940)), a right valued at least as highly as the "liberal ideals" underlying

civil discovery. We conclude that the government may be entitled to discover an employee's questionnaire to impeach or corroborate the testimony of that employee before the grand jury. To date, however, the grand jury has summoned no witnesses at all. We would act both prematurely and overbroadly were we to order production of all the questionnaires at this stage. We believe it advisable to allow the district court, after the issuance of new subpoenas, to consider the scope and timing of any such disclosure.

We do not believe, however, that the desire to impeach or corroborate a witness's testimony, by itself, would ever overcome the protection afforded the interview memoranda. This rule is implicit in *Hickman's* heightened protection of such material. *See* 329 U.S. at 512–13, 67 S.Ct. 385. As noted earlier, the testimonial quality of an attorney's memorandum raises grave concerns not raised by a witness's written statement.

In sum, we hold that all the questionnaires and interview memoranda are protected by the work-product doctrine. We believe that the government has demonstrated good cause to overcome that protection as to the questionnaire and interview memoranda generated by Sun's deceased employee. We do not believe, however, that the government has yet demonstrated good cause to overcome the protection as to any of the other questionnaires or interview memoranda.

### B

Because we cannot affirm the district court's entire order solely on the basis of the work-product doctrine, we are forced to confront Sun's alternative ground for quashing the subpoena. Sun asserts that the attorney-client privilege protects any questionnaire or interview memorandum derived from one of its employees. If Sun is correct, this privilege would prevent the

government from obtaining the deceased employee's materials, which we have held to be outside work-product protection. Additionally, the privilege would bar discovery of any other employee-generated materials which the grand jury might need in the future.

Perhaps the most commonly cited formulation of the attorney-client privilege is that offered by Judge Wyzanski in *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950):

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

The government advances several reasons why the attorney-client privilege should not apply to the questionnaires and interview memoranda. Most significantly, it argues that the individual employees who communicated with Pepper did not hold positions in the corporation that allowed them to speak for the "client." This argument forces us to confront an issue that has troubled courts for a number of years: the extent to which the attorney-client privilege protects communications to outside corporate counsel [2] by employees at various levels of the corporate hierarchy.

Although this issue began to receive attention more than 20 years ago, *see* Simon, *The Attorney-Client Privilege as Applied to*

---

2. Because all the communications at issue in this case were made to outside counsel, we need not confront the issue of whether and to what extent the attorney-client privilege protects communications made to in-house counsel. *See Natta v. Hogan,* 392 F.2d 686, 692 (10th Cir. 1968); *Hercules, Inc. v. Exxon Corp.,* 434 F.Supp. 136, 147 (D.Del.1977); *Hasso v. Retail Credit Co.,* 58 F.R.D. 425, 427 (E.D.Pa. 1973).

*Corporations,* 65 Yale L.J. 953 (1956), the seminal federal case was not decided until 1962. In *City of Philadelphia v. Westinghouse Electric Corp.,* 210 F.Supp. 483 (E.D. Pa.), *mandamus and prohibition denied sub nom. General Electric Co. v. Kirkpatrick,* 312 F.2d 742 (3d Cir. 1962), *cert. denied,* 372 U.S. 943, 83 S.Ct. 937, 9 L.Ed.2d 969 (1963), Judge Kirkpatrick recognized that, although corporations were entitled to invoke the attorney-client privilege, not every communication between corporate counsel and an employee merits the protection of the privilege. In striking the balance between confidentiality and disclosure, he held that

> if the employee making the communication, of whatever rank he may be, is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a body or group which has that authority, then, in effect, he is (or personifies) the corporation when he makes his disclosure to the lawyer and the privilege would apply.

*Id.* at 485.

This test, which focuses on the ability of the communicating employee to take discretionary action upon the attorney's advice, has been called the "control-group test." Since 1962, the issue confronted by Judge Kirkpatrick has received considerable attention in judicial opinions and legal commentaries. *See* notes 3–6, *infra,* and accompanying text. A clear majority of the federal courts adhere to the control-group test.[3]

In 1970, the Court of Appeals for the Seventh Circuit concluded that the control-group test was too restrictive of the privilege and chose instead to focus on the subject matter of the communication between the attorney and the employee. In *Harper & Row Publishers, Inc. v. Decker,* 423 F.2d 487, 491–92 (7th Cir. 1970), *aff'd by an equally divided court,* 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971), that court held that

> an employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's attorney is privileged where the employee makes the communication at the direction of his superiors in the corporation and where the subject matter upon which the attorney's advice is sought by the corporation and dealt with in the communication is the performance by the employee of the duties of his employment.

A few district courts outside the Seventh Circuit have credited this approach.[4]

More recently, the Court of Appeals for the Eighth Circuit, sitting en banc, agreed that the control-group test was too restrictive but concluded that the pure subject-matter test announced in *Harper & Row* was too broad. In *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596 (8th Cir. 1977), it chose a modified subject-matter test first proposed in Judge Weinstein's treatise on the Federal Rules of Evidence. *See* 2 Weinstein's Evidence ¶ 503(b)[04] (1975). That test would protect an employee's communication with corporate counsel if

> (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so

---

**3.** *See Natta v. Hogan,* 392 F.2d 686 (10th Cir. 1968); *In re Grand Jury Subpoena issued to General Counsel, John Doe, Inc.,* 81 F.R.D. 691 (S.D.N.Y.1979); *Virginia Elec. & Power Co. v. Sun Shipbuilding & Dry Dock Co.,* 68 F.R.D. 397 (E.D.Va.1975); *Burlington Indus. v. Exxon Corp.,* 65 F.R.D. 26 (D.Md.1974); *Honeywell, Inc. v. Piper Aircraft Corp.,* 50 F.R.D. 117 (M.D. Pa.1970); *Congoleum Indus., Inc. v. GAF Corp.,* 49 F.R.D. 82 (E.D.Pa.1969) (by stipulation), *aff'd mem.,* 478 F.2d 1398 (3d Cir. 1973); *Garrison v. General Motors Corp.,* 213 F.Supp.

515 (S.D.Cal.1963). *See also* Note, *Attorney-Client Privilege for Corporate Clients: The Control Group Test,* 84 Harv.L.Rev. 424 (1970) (endorsing control-group test).

**4.** *See Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1165 (D.S.C.1974); *Hasso v. Retail Credit Co.,* 58 F.R.D. 425 (E.D.Pa.1973). *See also Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.,* 62 F.R.D. 454 (N.D.Ill.1974), *aff'd mem.,* 534 F.2d 330 (7th Cir. 1976).

that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

572 F.2d at 609.[5] As noted earlier, legal commentators have seized upon the issue and have themselves proposed a host of alternative tests.[6]

 Confronted with such an array of possibilities, we feel compelled to examine certain basic principles. First, as all courts and commentators seem to agree, the attorney-client privilege exists to foster disclosure and communication between the attorney and the client. *See* 8 Wigmore on Evidence § 2291, at 545 (McNaughton rev. 1961). Nevertheless, because the privilege obstructs the search for the truth and because its benefits are, at best, "indirect and speculative," it must be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *Id.* at 554. *Cf. Herbert v. Lando,* —— U.S. ——, ——, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) ("Evidentiary privileges in litigation are not favored . . . ."). Moreover, although the need for a rule of predictable application has been questioned, especially in the corporate context, *see* Note, *The Attorney-Client Privilege: Fixed Rules, Balancing, and Constitutional Entitlement,* 91 Harv.L. Rev. 464 (1977), we agree with the majority view that the incentive to confide is at least partially dependent upon the client's ability to predict that the communication will be held in confidence. *See, e.g.,* 2 Weinstein's Evidence, *supra,* at p. 503–44; Note, 84 Harv.L.Rev., *supra* note 3, at 426–27, 430.

 With these principles in mind, we believe that the control-group test offers a suitable starting place for our analysis. That test, adopted by a majority of the federal courts, draws as bright a line as any of the proposed approaches. More important, there seems to be a consensus that this test affords a corporation the bare minimum of protection. Although many have argued that the test's protection is inadequate, no one yet has criticized it as overly generous. *But see Radiant Burners, Inc. v. American Gas Ass'n,* 207 F.Supp. 771 (privilege is not available at all to corporate clients), *aff'd on reconsideration,* 209 F.Supp. 321 (N.D.Ill.1962), *rev'd,* 320 F.2d 314 (7th Cir.) (en banc), *cert. denied,* 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963). As even one critic of the control-group test has noted, "[t]he idea at the core of the control group cases is a sound one: to restrict the application of the privilege so that it shelters only those communications that it is socially desirable to protect." Kobak, *supra* note 6, at 365–66. We believe that it is socially desirable to protect, at a minimum, communications made by a person who has the authority to take part in a decision about any action to be taken in response to the solicited advice. Whether the privilege should be enlarged beyond that point should depend upon whether a broader rule would serve the policy of full communication underlying the privilege itself.[7]

**5.** *See also* Note, *Corporate Attorney-Client Privilege—Diversified Industries, Inc. v. Meredith—The Modified Harper & Row Test,* 4 J.Corp.L. 226 (1978) (endorsing *Diversified* test).

**6.** *See, e.g.,* Kobak, *The Uneven Application of the Attorney-Client Privilege to Corporations in the Federal Courts,* 6 Ga.L.Rev. 339 (1972) (test focusing on whether advice was sought in course of corporate duties and in advance of conduct); Simon, *The Attorney-Client Privilege as Applied to Corporations,* 65 Yale L.J. 953 (1956) (test classifying employees as "managing agents," "communicating agents," or "source agents"); Note, *The Corporate Attor-*

*ney-Client Privilege in the Federal Courts,* 22 Catholic Law. 138 (1976) (an "expanded" control-group test); Note, *Evidence—Privileged Communications—The Attorney-Client Privilege in the Corporate Setting: A Suggested Approach,* 69 Mich.L.Rev. 360 (1970) (a "natural or appropriate person" approach); Note, *The Privileged Few: The Attorney-Client Privilege As Applied to Corporations,* 20 U.C.L.A.L. Rev. 288 (1972) (an "expanded" control-group test).

**7.** It has been argued that *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), bars any rule broader than the control-group test. *See City of Philadelphia v. Westinghouse*

Criticism of the control-group test usually begins with the observation that a corporate client is different from an individual client. An individual can tell the attorney the relevant facts and then act on the attorney's advice. In the corporate setting, however, the people who know the relevant facts and the people who make the decisions are seldom the same. If an attorney is going to give sound advice to the control group, he must secure information from outside the control group. The attorney's need for this information allegedly dictates the conclusion that the communications should be privileged. *See, e.g., Diversified Industries, Inc. v. Meredith, supra,* at 608–09; Kobak, *supra* note 6, at 368; Note, 69 Mich.L.Rev., *supra* note 6, at 374.

Although we agree that an attorney often needs to secure information from lower-echelon employees, we are not convinced that extension of the corporation's attorney-client privilege would enhance his or her ability to secure that information. The "confidentiality" offered to non-control-group employees would be quite illusory from their standpoint. Because they have no control over the privilege itself, their communications remain confidential only in the sense that they are not released to outsiders, and only as long as the corporate control group desires to assert the privilege. If the employees had engaged in questionable activity, the corporation clearly would have the power to waive the privilege and to turn the employees' statements over to law enforcement officials. *See, e. g., Diversified Industries, Inc. v. Meredith, supra,* at 611 n.5. Privilege or no privilege, lower-level employees would confide in corporate counsel at their own risk. Conversely, where no questionable activity is involved, non-control-group employees have little reason not to relate information to corporate counsel, especially where a superior has instructed them to do so. In short, we do not believe that extension of the corporation's privilege against disclosure would significantly add to an attorney's ability to obtain information from employees outside the control group.

Other critics of the control-group test have focused on the possibility that an attorney will be less willing to ferret out relevant information if it will not be privileged. In *Diversified,* for example, the Eighth Circuit expressed concern about confronting corporate counsel with a dilemma: " 'If he interviews employees [outside the control group], their communications to him will not be privileged. If, on the other hand, he interviews *only* [the control group], he may find it extremely difficult, if not impossible, to determine what happened.' " 572 F.2d at 609, *quoting* Weinschel, *Corporate Employee Interviews and the Attorney-Client Privilege,* 12 B.C. Ind. & Comm.L.Rev. 873, 876 (1970) (emphasis in original). We believe, however, that the Supreme Court adequately dealt with this dilemma in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). There, the Court considered the detrimental effect of allowing an opponent to discover information collected by an attorney in the course of an investigation:

> Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And

---

*Elec. Corp., supra,* at 485. *See also* Note, 84 Harv.L.Rev., *supra* note 3, at 433 n.28. In *Hickman,* the witnesses that defendant's attorney interviewed were employees of defendant. Nevertheless, the Supreme Court held that the attorney-client privilege did not protect the interviews: "it suffices to note that the protective cloak of this privilege does not extend to information which an attorney secures from a witness while acting for his client in anticipa-

tion of litigation." 329 U.S. at 508, 67 S.Ct. at 392.

In apparent response to this holding, both the *Harper & Row* court and the *Diversified* court expressly excepted from the privilege information gathered by employees as mere "bystander witnesses." *See Harper & Row Pub., Inc. v. Decker, supra,* at 491; *Diversified Indus., Inc. v. Meredith, supra,* at 609.

the interests of the clients and the cause of justice would be poorly served.

*Id.* at 511, 67 S.Ct. at 394. In balancing these concerns against the liberal policies of discovery, the Court concluded that the protection afforded work product should be qualified, not absolute. That doctrine, of course, only applies when the attorney acts in anticipation of litigation. Nevertheless, where there is no prospect of litigation, corporate counsel has little reason to be apprehensive about the unprivileged nature of his investigation. Moreover, we believe that an attorney should and would resolve any remaining apprehension in favor of a complete investigation.

Some courts and commentators have suggested that the control-group test discourages a corporation from conducting internal investigations. *See, e.g., Diversified Industries, Inc. v. Meredith, supra,* at 609; *Report of the Committee on the Federal Courts of the New York County Lawyers Association* 7–10 (April 1970), *quoted in* 2 Weinstein's Evidence, *supra,* at p. 503–12 n.1. The short answer to this argument is that they have little choice. We do not doubt that the ability to conduct a confidential investigation would make "compliance with the complex laws governing corporate activity" more palatable, *see Report of the Committee on Federal Courts, supra;* we do doubt, however, that a corporation would risk civil or criminal liability under those complex laws by foregoing introspection. In our opinion, the potential costs of undetected noncompliance are themselves high enough to ensure that corporate officials will authorize investigations regardless of an inability to keep such investigations completely confidential. *See* Note, 84 Harv.L.Rev., *supra* note 3, at 431–32. Moreover, having been alerted to the applicable rule, corporate officials will attempt to adapt their dealings with counsel to maximize both the confidentiality and the utility of their communications. *See e. g.,* Brown & Hyman, *The Scope of the Attorney-Client Privilege in Corporate Decision Making,* 26 Bus.Law. 1145, 1156–57 (1971). By adopting the majority approach, we would move the federal courts one step closer to a uniform rule, thereby facilitating such adaptation.

Perhaps, as Judge Heaney has argued, application of the control-group test will result in less frequent use of attorneys as corporate sleuths. *See Diversified Industries, Inc. v. Meredith, supra,* at 606 (Heaney, J., concurring and dissenting from panel opinion). A broader test undoubtedly would encourage the employment of outside counsel to conduct internal corporate investigations. Judge Heaney felt that this incentive was desirable because attorneys "are not only professionally trained but . . . are obligated by their code of ethics to make a thorough and complete report." *Id.* Even assuming the desirability of such an incentive, however, we do not believe that application of the narrower control-group test will significantly reduce it. As one commentator has noted, attorneys and corporations are "ineluctable bedfellows." Note, 91 Harv.L.Rev., *supra,* at 474. Furthermore, in appropriate cases, an attorney will be able to offer the corporation the limited confidentiality afforded by the work-product doctrine.

In sum, we find no persuasive reason to deviate from the approach taken by the majority of the federal courts. We believe that the control-group test is both broad enough and flexible enough to accommodate the needs of a corporate client. Having reached this conclusion, we have no difficulty applying it to the facts of this case. Sun has conceded that none of the interviewed employees were members of the relevant control group, as defined by the ability to take part in a decision about action to be taken in response to Pepper's advice on this matter. None of the contested documents, therefore, is protected by the attorney-client privilege. Because we conclude that the attorney-client privilege does not apply in this case, we need not reach the government's claim that Sun waived the privilege.

## III

The judgment of the district court will be reversed insofar as it quashed that portion

of the subpoena seeking the questionnaire and interview memoranda derived from Sun's deceased employee. In all other respects the judgment of the district court will be affirmed in accordance with this opinion. The parties will bear their own costs.

ALDISERT, Circuit Judge, dissenting.

One who has been served with a federal grand jury subpoena *duces tecum* may move the district court to quash the subpoena. If the motion is denied, the subject of the subpoena may not obtain immediate appellate review of the order, *United States v. Ryan,* 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971); *Cobbledick v. United States,* 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940). This case presents the converse situation—the government seeks immediate appellate review of a district court order granting a motion to quash a grand jury subpoena. The majority finds such an order to be appealable, on the authority of *In re Grand Jury Empanelled February 14, 1978 (Colucci),* 597 F.2d 851 (3d Cir. 1979). Because I believe that *Colucci* was wrongly decided, I dissent from the majority's determination that this court possesses subject matter jurisdiction to entertain this appeal.

The panel in *Colucci* accepted the government's contentions in favor of appealability, which were also made before this panel at its own request, and held that two separate grounds support the government's right to appeal: (1) 28 U.S.C. § 1291, granting juris-diction to courts of appeals from final decisions of district courts, and (2) 18 U.S.C. § 3731,[1] allowing appeals by the government in criminal proceedings under certain circumstances.[2] *Colucci's* analysis of the basic issues was, in my view, incomplete and unconvincing. With respect to § 1291, it has not persuaded me that what is sauce for the goose, *i. e.,* the grand jury witness whose motion to quash a subpoena is denied, should not also be sauce for the government gander when such a motion is granted. It does not present a reasoned analysis of why an individual who fails to prevail before a district court is denied a review while the government, when it loses, is entitled to review. *Colucci* does not provide a reasoned discourse on why a district court's order denying relief is not a final judgment, while an order granting relief is. *Colucci* puts this court's imprimatur on a judicial process that permits the government to say, "Heads I win, tails you lose." Such blatant inequality of opportunity for appellate relief offends the most primitive notions of fairness conceptualized on right reason distributed equally.

The *Colucci* panel's treatment of § 3731 is even less persuasive. It pronounces an *ipse dixit* that a grand jury's session is a "criminal proceeding" and blithely refuses to discuss whether the subject of the subpoena qualifies as "a substantial proof of a fact material in the proceeding," a statutory concomitant of an appeal under § 3731.

1. 18 U.S.C. § 3731, *as amended* Jan. 2, 1971, provides:

 In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.
 An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.
 The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.
 Pending the prosecution and determination of the appeal in the foregoing instances, the defendant shall be released in accordance with chapter 207 of this title.
 The provisions of this section shall be liberally construed to effectuate its purposes.

2. Indicative of the government's initial assessment of its right to appeal under § 3731 is the fact that the statutorily required certification by the U.S. Attorney was first filed on April 9, 1979, *after* oral argument had already been heard in this case.

Indeed, this factor seems to have been swept under the juridical rug.

## I.

The starting point for any consideration of the § 1291 final judgment rule in this case is the express determination by the Supreme Court in *DiBella v. United States,* 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962):

> An order *granting or denying* a pre-indictment motion to suppress does not fall within any class of independent proceedings otherwise recognized by this Court, and there is every practical reason for denying it such recognition.

. . . . .

> We hold, accordingly, that the mere circumstance of a pre-indictment motion does not transmute the ensuing evidentiary ruling into an independent proceeding begetting finality even for purposes of appealability.

*Id.* at 129, 131, 82 S.Ct. at 659–660 (my emphasis).

The purposes underlying the jurisdictional requirement of finality, embodied in 28 U.S.C. § 1291, are to promote effective and efficient judicial administration and to encourage the just and speedy resolution of legal controversies. *Cobbledick v. United States, supra,* 309 U.S. at 325, 60 S.Ct. 540; *Bachowski v. Usery,* 545 F.2d 363, 369 (3d Cir. 1976). To effectuate this policy, § 1291 prevents piecemeal review of "what for practical purposes is a single controversy"; the intent of the rule is to unify review of the entire case in a single appeal. *Cobbledick v. United States, supra,* 309 U.S. at 325, 60 S.Ct. at 541. The Supreme Court continues to reiterate its disfavor of interlocutory appeals, viewing finality of judgment as an essential predicate for federal appellate jurisdiction. *United States v. MacDonald,* 435 U.S. 850, 853, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978); *Abney v. United States,* 431 U.S. 651, 656, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). The rule of finality avoids "the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment." *Cobbledick, supra,* 309 U.S. at 325, 60 S.Ct. at 541.

Courts have often noted that § 1291 is to be given a "practical rather than a technical construction." *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). This statement is the basis of the government's first argument, anchored tightly on *In re Grand Jury Proceedings (U.S. Steel-Clairton Works),* 525 F.2d 151 (3d Cir. 1975). I think the holding of that case, however, undermines rather than supports a determination of appealability in the present case. *U.S. Steel-Clairton Works* involved a district court order indefinitely staying grand jury proceedings pending the completion of related litigation in the state courts. We held the order appealable under § 1291 essentially for the reason that the indefinite stay of the grand jury proceedings had the practical effect of dismissing the proceedings since it was likely that the grand jury's term would expire before the stay was lifted. *Id.* at 155–56.

By contrast, there has been no such practical final disposition of the present case. That the government may not have access to the interview memoranda requested in the subpoena *duces tecum* does not affect the entire grand jury proceeding the way the *U.S. Steel-Clairton Works* order did. As the majority opinion makes clear, Sun has produced all the documents requested by the government except the memoranda which Sun claims are privileged. The quashing of the subpoena here does not block even "a significant portion" of the grand jury proceedings, as the government argues, because the government has not been denied access to the individuals whose interviews with the Pepper firm are the subject of the memoranda in controversy. In fact, Sun has made available to the government the names and addresses of all the persons interviewed by Pepper and has offered to help contact them. The government may acquire the same information contained in the privileged memoranda by

questioning these persons before the grand jury.

The government's other § 1291 appealability argument is that it has no recourse to what it claims is the traditional avenue of appellate review in cases such as this because, unlike a party whose motion to quash a grand jury subpoena is denied, the government cannot resist the district court's order and submit to a possible adjudication of contempt. The inability to invoke contempt proceedings and thereby gain indirect review of what cannot be reviewed directly is not a sufficient reason, in itself, to find that the district court's order is appealable under § 1291. This identical argument, apparently accepted in *Colucci* and, of course, by the majority here, was specifically *rejected* by the Supreme Court in *DiBella v. United States, supra*:

> Nor are the considerations against appealability made less compelling as to orders granting motions to suppress, by the fact that the Government has no later right to appeal when and if the loss of evidence forces dismissal of its case. . . . [T]he Government is no more disadvantaged than in the case of an adverse ruling on the evidence during trial. . . . What disadvantage there be springs from the historic policy, over and above the constitutional protection against double jeopardy, that denies the Government the right of appeal in criminal cases save as expressly authorized by statute. . . . No such expression appears in 28 U.S.C. § 1291, and the Government's only right of appeal, given by the Criminal Appeals Act of 1907, 34 Stat. 1246, now 18 U.S.C. § 3731, [18 U.S.C.A. § 3731] is confined to narrowly defined situations not relevant to our problem. Allowance of any further right must be sought from Congress and not this Court.

369 U.S. at 130, 82 S.Ct. at 659–660 (citations omitted).

Where the recipient of a grand jury subpoena has sought appellate review of an adverse district court order to quash, the Supreme Court, in denying appellate review, has recognized that the same policies of safeguarding against undue interruption and obstruction that preclude interlocutory appeals during trials apply equally to grand jury proceedings:

> The Constitution itself makes the grand jury a part of the judicial process. It must initiate prosecution for the most important federal crimes. It does so under general instructions from the court to which it is attached and to which, from time to time, it reports its findings. The proceeding before a grand jury constitutes "a judicial inquiry," . . . of the most ancient lineage. . . . The duration of its life, frequently short, is limited by statute. It is no less important to safeguard against undue interruption the inquiry instituted by a grand jury than to protect from delay the progress of the trial after an indictment has been found. Opportunity for obstructing the "orderly progress" of investigation should no more be encouraged in one case than in the other. That a grand jury proceeding has no defined litigants and that none may emerge from it, is irrelevant to the issue. . . . Whatever right [the witness] may have requires no further protection in either case than that afforded by the district court until the witness chooses to disobey and is committed for contempt. . . . At that point, the witness' situation becomes so severed from the main proceeding as to permit an appeal. To be sure, this too may involve an interruption of the trial or of the investigation. But not to allow this interruption would forever preclude review of the witness' claim, for his alternatives are to abandon the claim or languish in jail.

*Cobbledick, supra,* 309 U.S. at 327–28, 60 S.Ct. at 542 (citations omitted).

Denial of review of orders refusing to quash subpoenas is not founded upon the possibility of reviewing subsequent contempt proceedings but upon the more fundamental ground that they are not final orders. That a contempt proceeding is reviewable is due to its independent, separate nature. If an individual has refused to

comply with the subpoena and is punished for contempt, the whole character of the case has changed. The proceeding has become personal to him rather than retaining its general investigative nature. *See id.* at 327, 60 S.Ct. 540. That the claim involved in a contempt decision is one of personal privilege adds a constitutional dimension of some import.

The Supreme Court has allowed exception to the rule that one who is denied his request to have a subpoena quashed must produce the desired information or resist the order and face the possibility of contempt charges "in the limited class of cases where denial of immediate review would render impossible any review whatsoever of an *individual's* claims." *United States v. Ryan, supra,* 402 U.S. at 533, 91 S.Ct. at 1582 (my emphasis). Thus, "review is available immediately of a denial of a motion for the return of seized property, where there is no criminal prosecution pending against the movant" because "[d]enial of review in such circumstances would mean that the Government might indefinitely retain the property without any opportunity for the movant to assert on appeal his right to possession." *Id.* Similarly, the Supreme Court has

> allowed immediate review of an order directing a third party to produce exhibits which were the property of appellant and, he claimed, immune from production. To have denied review would have left [the appellant] 'powerless to avert the mischief of the order' . . . for the custodian could hardly have been expected to risk a citation for contempt in order to secure [the appellant] an opportunity for judicial review.

*Id.* (citation omitted).

This court has recognized that "[e]very interlocutory order involves, to some degree, a potential loss," but that this risk "must be balanced against the need for efficient federal judicial administration." *Borden Co. v. Sylk,* 410 F.2d 843, 846 (3d Cir. 1969). When a district court ruling is adverse to the government and the government is the party seeking review, however, there is no constitutional right or other important privilege at stake. *Cf. United States v. Ryan, supra,* 402 U.S. at 533, 91 S.Ct. 1580. It may be important to interrupt judicial proceedings for appeal if a claim of privilege or constitutional right will not otherwise receive review. In the present case, however, as the Supreme Court held in *DiBella,* the public interest does not weigh heavily enough on the government's side to overcome the policy against piecemeal review.

Of the considerations that compete in the question of appealability the Supreme Court has said that the most important are "the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other." *Dickinson v. Petroleum Conversion Corp.,* 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950) (footnote omitted). As noted in *Bachowski v. Usery, supra,* 545 F.2d at 371, this court has taken a strong stand on the importance of finality in promoting judicial efficiency and "has frowned upon expansive judge-made exceptions to the final judgment rule" and been reluctant "to inflate the boundaries of section 1291." We have recognized that the strong policies underlying finality may be counter-balanced, but not outweighed, by the costs of imposing the rule denying immediate review. Those costs may include the possible permanent foreclosure of all opportunity for review, the possible infliction of irreparable harm on the aggrieved party, and the possibility of a net waste of effort and delay.

This case is not one which requires immediate review. It is precisely the type of case in which immediate review inhibits the smooth flow of the judicial process, increases the burden on the appellate court, and leaves open an opportunity for delay and harassment. If the government were able to appeal every decision quashing a subpoena issued during a grand jury investigation, the grand jury process could be seriously abused. The opportunity for harassment would increase as individuals under investigation would be left in uncertainty, pending a government appeal, as to whether they

must testify or produce documents. Orders granting or quashing grand jury subpoenas are analogous to orders compelling or denying discovery which "bespeak their own interlocutory character" and are rarely appealable. *Borden Co. v. Sylk, supra,* 410 F.2d at 845. In essence, the government can use the grand jury investigation to discover evidence that it might use in a subsequent criminal proceeding. If discovery orders are interlocutory, so is this one.

In contrast with the important interests which would be advanced by denial of review in this case, the costs would be miniscule. First, as noted, the order did not have the practical effect of concluding the grand jury proceedings and review is not permanently foreclosed because the issue may arise again at a later stage if the case proceeds to trial. There should have been no significant disruption of the investigation because the government was, and is, free to interview the witnesses independently. Whatever minor inconvenience might have been caused the government, the additional effort required is far from sufficient to counterbalance the rule of finality.

Nor does this case fall under the "collateral order doctrine" announced in *Cohen v. Beneficial Industrial Loan Corp., supra.* In *Rodgers v. U. S. Steel Corp.,* 508 F.2d 152 (3d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), this court interpreted *Cohen* as requiring three elements: "The order must be a final rather than a provisional disposition of an issue; it must not be merely a step toward final disposition of the merits; and the rights asserted would be irreparably lost if review is postponed until final judgment." *Id.* at 159. *See also Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468–69, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). On the basis of the third element alone, this case is clearly outside the *Cohen* precept. It is impossible to say that any rights are irretrievably lost; the government is free to gather the same information by questioning the same persons interviewed by Pepper. Moreover, the underlying issue is not an independent question of law but is intertwined with the very

substance of the investigation. *See Borden Co. v. Sylk, supra.* The government itself has asserted that the reason it wants the attorneys' memoranda is to determine whether Sun has been involved in a cover-up which might involve the very statements made to the attorneys.

Finally, neither the court's view of the expediency of immediate review, nor the topicality or significance of the underlying issues may be allowed to expand our appellate jurisdiction under § 1291. Judge Adams warned against this temptation in *Bachowski v. Usery, supra* :

> This case provides ample illustration of the proposition that application of the final order doctrine is often made with considerable diffidence. The substance of the dispute here is highly significant, and immediate resolution would clarify an important aspect of federal law as well as possibly terminating a lengthy controversy. However, the wisdom of the final judgment rule lies in its insistence that we focus on systemic, as well as particularistic impacts. The appellate system has become increasingly overburdened and the future would appear to promise no relief from the continuous increase in case loads. Accordingly, it would seem to us to be a disservice to the Court, to litigants in general and to the idea of speedy justice if we were to succumb to enticing suggestions to abandon the deeply-held distaste for piecemeal litigation in every instance of temptation. Moreover, to find appealability in those close cases where the merits of the dispute may attract the deep interest of the court would lead, eventually, to a lack of principled adjudication or perhaps the ultimate devitalization of the finality rule as enacted by Congress.

545 F.2d at 373–74.

The finality rule embodied in § 1291 must be applied in accordance with the foregoing precepts. Proper application within both the spirit and the letter of these precepts mandates the conclusion that the order appealed from is not a final judgment. If

there be any comfort to the government's position, therefore, it must be found in § 3731,[3] the Congressional response in 1971 to the 1962 invitation of the Supreme Court in *DiBella.*

## II.

The government argues that because the district court's order was one excluding evidence, it may appeal therefrom on the basis of 18 U.S.C. § 3731. This statute explicitly provides that the evidence must be excluded in "a criminal proceeding" and that "the evidence [must be] a substantial proof of a fact material in the proceeding." I recognize that grand jury proceedings are hybrid in character, partaking of the nature of both civil and criminal actions and lacking certain characteristics of each. For the purposes of this statute, however, I would hold that the investigation is not a criminal proceeding and that § 3731 provides the government no right to appeal in this case.

I believe a grand jury investigation is more accurately viewed as a prelude to a criminal proceeding than a part of it. Support for this view can be found in the teachers of the Supreme Court which refuse to afford to grand jury witnesses the constitutional protections commonplace in criminal proceedings. Thus, in *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the Court noted:

> The scope of the grand jury's powers reflects its special role in insuring fair and effective law enforcement. A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an *ex parte* investigation to determine whether a crime has been committed and *whether criminal proceedings should be instituted* against any person.

*Id.* at 343–44, 94 S.Ct. at 617–618 (my emphasis).

The issue in *Calandra* was whether the exclusionary rule, under which "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure," applied in grand jury proceedings. 414 U.S. at 347, 94 S.Ct. at 619. The Court's refusal to apply the rule, stating that it "has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons," *id.* at 348, 94 S.Ct. at 620, is, in my view, tantamount to a determination that a grand jury investigation is not a criminal proceeding.

Constitutionally protected rights guaranteed to defendants in criminal trials have been denied the subjects of grand jury investigations. In *United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), the plurality concluded that *Miranda* warnings need not be given to a grand jury witness called to testify about criminal activities in which he may have been personally involved. Chief Justice Burger's plurality opinion also stated that the Sixth Amendment right to counsel is not guaranteed at grand jury investigations:

> Respondent was also informed that if he desired he could have assistance of counsel, but that counsel could not be inside the grand jury room. That statement was plainly a correct recital of the law. *No criminal proceedings had been instituted against respondent,* hence the Sixth Amendment right to counsel had not come into play. *Kirby v. Illinois,* 406 U.S. 682, [92 S.Ct. 1877, 32 L.Ed.2d 411] (1972).

425 U.S. at 581, 96 S.Ct. at 1779 (my emphasis).

*Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), determined that an accused is not entitled to counsel at an identification in a police station after arrest but prior to any formal charge, preliminary hearing, indictment, information or arraignment. The Court described what is entailed in the initiation of criminal proceedings:

---

**3.** At least one other circuit, the Seventh, has held that district court orders in the course of grand jury proceedings are appealable *only* if they fall within the collateral order exception to the final judgment rule. *In re Special February 1977 Grand Jury,* 581 F.2d 1262, 1263 (7th Cir. 1978).

The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.

*Id.* at 689–90, 92 S.Ct. at 1882 (footnote and citations omitted). It can hardly be said that at the grand jury *investigation* stage "the government has committed itself to prosecute" or that "the adverse positions of government and defendant have solidified."

The implicit message of decisions by two other courts of appeals strongly supports this position. Both involved review of district court orders pertaining to ongoing grand jury proceedings and both held that there was no appellate jurisdiction under 28 U.S.C. § 1291 because the challenged orders were not final. The rationale of both courts was based in part on the appellants' failure to seek certification of the non-final orders under 28 U.S.C. § 1292(b), which is applicable only "in a civil action." *In re*

*Doe,* 546 F.2d 498 (2d Cir. 1976), dismissed the appeal of grand jury targets from a district court order denying their motion to enjoin the grand jury from investigating them for possible criminal violations of the Internal Revenue Code. But the court never considered the grand jury investigation to be anything but a civil proceeding. The only reason the district court order was not appealable under § 1292(b) was the absence of an accompanying certification from the district judge as to the controlling question of law to be appealed. *Id.* at 501–02.

More recently, the First Circuit dismissed the government's appeal from the denial of a Fed.R.Crim.P. 6(e) disclosure petition. In stating why the *Cohen* collateral order precept was not available, the court was of the view that the government had several alternative means of avoiding an irretrievable loss of rights in the absence of immediate appeal: "[T]he Government could either have sought the cooperation of the district court in certifying this question under § 1292(b), or if it felt that circumstances warranted, go into contempt in order to obtain appellate review." *In re Grand Jury Proceedings,* 580 F.2d 13, 17 (1st Cir. 1978). Again, because § 1292(b) applies only "in a civil action," fundamental to the reasoning of the First Circuit, like the Second Circuit in *In re Doe,* was an implicit determination that grand jury proceedings were civil, not criminal, proceedings.[4]

---

**4.** Although the *Colucci* opinion quoted from the Senate Report on the 1971 amendments to the Criminal Appeals Act (18 U.S.C. § 3731), the legislative history really does not address the issue of the appealability of an order quashing a subpoena *duces tecum* in the course of a grand jury investigation. The scope of the 1970 amendment was summarized as follows:

It is the purpose of this bill to resolve serious problems which frequently have arisen with respect to the right of the United States to appeal rulings which terminate prosecutions other than by judgment of acquittal, or which grant motions to suppress evidence before trial or in subsequent proceedings ancillary to the trial.

The bill furthers that purpose by making four principal changes in the present Criminal Appeals Act (18 U.S.C. 3731).

First, it eliminates technical and outmoded distinctions in pleadings as limitations on appeals by the United States. In their place, it confers a right to appeal any decision terminating a prosecution except an acquittal.

Second, it makes the Government's right to appeal an order suppressing evidence applicable to all criminal proceedings, including probation revocation hearings, not merely to pretrial suppressions. It continues, however, to deny authority for appeals from suppression orders made during trial of indictments and informations.

Third, it requires that all appeals by the United States be taken to courts of appeals, except that an appeal from a decision based at least in part on a determination of the invalidity of an act of Congress may, upon a district court order or the Attorney General's certification for that purpose, be taken to the Supreme Court, which then may decide the case or remand it to the court of appeals.

The government simply cannot have it two ways—it cannot argue vociferously that a grand jury investigation is not a criminal proceeding when the constitutional rights of witnesses are implicated, and then thunder just as stridently that the investigation is a criminal proceeding when the question of its right to appeal is at stake. No court should accept such sophistry.

## III.

Although *Colucci* was the first decision by our court on this subject, the majority makes the generous statement that "we recently settled this question" of appealability in that single case. Trained in the common law tradition, I do not subscribe to the notion that a single case ever "settles" the law. A single case may serve as a precedent—a legal precept attaching a detailed legal consequence to the detailed set of facts of an adjudged case which is then considered as furnishing the rule for the determination of a subsequent case containing material facts identical or similar to those in the adjudged case, arising in the same court, or a lower court in the judicial hierarchy.[5]

To rely on a case as persuasive or controlling precedent, the court must first extract the rule from the putative precedent. A rule is a normative legal precept containing both specific facts and a specific result, the legal result depending upon the establishment of certain facts stipulated or found in the antecedent part of the rule. Since a precedent's force resides in the rule of law it expresses, that force must be measured by precise facts which gave rise to the rule. "Two cases or decisions which are alike in all material respects, and precisely similar in all the circumstances affecting their determination, are said to be or to run 'on all fours' with each other, or, in the more ancient language of the law, the one is said to 'run upon four feet' with the other."[6] But identity is not a requirement; indeed, the reality is that fact complexes seldom repeat themselves exactly. Thus, the force of a precedent depends upon both the reason supporting the rule of the case and the material facts giving rise to it.

Professor Edward H. Levi has carefully and clearly identified the three steps involved in the doctrine of precedent: "similarity is seen between cases; next the rule of law inherent in the first case is announced; then the rule of law is made applicable to the second case."[7] The determination of similarity *vel non* between the cases is crucial, for "the scope of a rule of law, and therefore its meaning, depends upon a determination of what facts will be considered similar to those present when the rule was first announced. The finding of similarity or difference is the key step in the legal process."[8]

Thus, even assuming the viability of *Colucci's* interpretation of § 3731 on the basis of the facts of that case—a subpoena *duces*

---

Fourth, it provides for liberal construction of the Criminal Appeals Act.
S.Rep.No.1296, 91st Cong., 2d Sess. 2 (1970).
The amendments were meant to deal with *three problems identified with the old § 3731*: (1) the act failed to provide for any appeal by the government from many frequently encountered types of dismissals, and from some improper orders suppressing evidence, (2) the act required that an appeal in many cases be taken directly to the Supreme Court, and (3) an ambiguity and absence of settled meaning surrounding many of the statute's existing provisions resulted in a considerable and needless expenditure of prosecutorial and judicial resources. *Id.* at 2–3.
Even though the act expressly liberalizes the government's right to appeal, the legislative history only speaks in terms of assuring "that the United States may appeal from the dismiss-

al of a *criminal prosecution* by a district court in all cases where the Constitution permits." *Id.* (my emphasis).

5. *See, inter alia,* observations of Henry Campbell Black, Sir William Blackstone, John Hanna, Roscoe Pound, Richard A. Wasserstrom, Rupert Cross, Herman Oliphant and Thomas S. Currier, collected in *Anatomy of Precedent* in R. Aldisert, The Judicial Process 777–801 (1976).

6. H. Black, The Law of Judicial Precedents 61 (1912).

7. Levi, *An Introduction to Legal Reasoning,* 15 U.Chi.L.Rev. 501, 501–02 (1948).

8. *Id.* at 502.

*tecum* directed to a third party custodian of business records—those facts, in my view, are not substantially similar to the facts at bar. Arguably, the records there sought to be seized could qualify under the statutory description of evidence that is "a substantial proof of a fact material in the proceeding." Here, the evidence sought by the subpoena *duces tecum* constituted questionnaires and interview memoranda prepared by counsel. As set forth in Part I, the government had knowledge of the specific names and addresses of those questioned and interviewed by the Pepper law firm. In this case the evidence sought is at best secondary and insubstantial, yet primary, and therefore substantial, evidence is available; I therefore fail to see how the production of questionnaires and interviews qualifies under the statutory description "that the evidence is a substantial proof of a fact material in the proceeding." *A fortiori,* when access to the evidence is denied on the basis of the attorney work product principle, as the majority holds, such evidence clearly does not qualify as "proof," as contemplated by Congress in its 1971 formulation of § 3731. In my view an appealability determination under this statute requires a careful consideration of the quality of the suppressed evidence, even if subsequent consideration of the merits would track part of the same inquiry.

Because such a careful examination of the quality of the evidence is central to the question of appealability under § 3731, I cannot accept the majority's characterization of the sophisticated appealability issue presented in this case as "recently settled." Roscoe Pound warned against hasty generalization:

> You cannot frame a principle with any assurance on the basis of a single case. It takes a long process of what Mr. Justice Miller used to call judicial inclusion and exclusion to justify you in being certain that you have hold of something so general, so universal, so capable of dealing with questions of that type that you can say here is an authoritative starting point for legal reasoning in all analogous cases.

> . . . . .

> A single decision as an analogy, as a starting point to develop a principle, is a very different thing from the decision on a particular state of facts which announces a rule. When the court has that same state of facts before it, unless there is some very controlling reason, it is expected to adhere to the former decision. But when it [goes] further and endeavors to formulate a principle, *stare decisis* does not mean that the first tentative gropings for the principle, what is said in the course of development of the principle by this process of judicial inclusion and exclusion are of binding authority.[9]

## IV.

For all the foregoing reasons, I would hold that the district court's order was not a final judgment under § 1291, nor was it the type of order for which an appeal lies under § 3731, and that this court therefore lacks subject matter jurisdiction to consider the merits of the government's appeal. I would dismiss the appeal for want of jurisdiction, and assess costs on the appellant.

---

9. Pound, *Survey of Conference Problems,* 14 U.Cin.L.Rev. 324, 330–31 (1940). Professor Joseph Raz has said, "A court can establish a new rule in a single judgment which becomes a precedent. Principles are not made into law by a single judgment; they evolve rather like a custom and are binding only if they have considerable authoritative support in a line of judgments." Raz, *Legal Principles and the Limits of Law,* 81 Yale L.J. 823, 848 (1972). *See also* Aldisert, *Opinion Writers and Law Review Writers: A Community and Continuity of Approach,* 16 Duq.L.Rev. 139, 144–46 (1977–1978).